No. 28,700.

THE HUDSON STATE BANK, *Appellant,* v. M. M. RICHARDSON et al., *Appellees.*

(276 Pac. 815.)

Opinion filed May 4, 1929.

*Robert Garvin* and *Evart Garvin,* both of St. John, *A. C. Malloy, R. C. Davis* and *Warren H. White,* all of Hutchinson, for the appellant.

*C. M. Williams, D. C. Martindell* and *W. D. P. Carey,* all of Hutchinson, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one by a bank, the payee of a promissory note, to recover from the makers. The defense was that the makers executed the note without consideration and solely for the accommodation of the bank. Defendants prevailed, and plaintiff appeals.

The note sued on was dated March 10, 1927, was for $4,000, payable on September 10, 1927, and was secured by real-estate mortgage. The makers were M. M. Richardson and his wife, Maggie L. Richardson. The payee was the Hudson State Bank. F. W. Tretbar, a practicing physician, was president of the bank. Two of his brothers, one a physician and the other a dentist, were stockholders. E. O. Anderson was cashier. M. M. Richardson had two sons, Clayton, aged twenty-three, who was an automobile salesman at Mulvane, and Raymond, a high-school boy fifteen or sixteen years old, who was a clerk in a drug store at Stafford, and had an aspiration to become a pharmacist. R. B. Paine had a drug store at Hudson. In January, 1925, Clayton Richardson, who had no money, bought the drug store, and, by previous arrangement with the bank, paid for the drug store by his check on the bank for $8,347. After the transaction of sale was concluded, Clayton Richardson gave his note to the bank for the amount of the check. Afterwards M. M. Richardson signed the note. Clayton's wife and mother also signed, but it is not necessary to carry their names throughout the narrative. In April or May, 1925, the original note was taken up by two notes, one for $4,000 signed by M. M. Richardson, and one for the remainder of the original note signed by Clayton Richardson. The note sued on was a renewal of M. M. Richardson's $4,000 note.

The testimony of the Richardsons concerning the origin of the notes and the circumstances under which they were executed cannot be reconciled with the testimony of the bank officers. The court and jury accepted the testimony of the Richardsons, and this court has no further interest in the opposing testimony. The testimony of the Richardsons disclosed that M. M. Richardson received no consideration whatever for the notes he signed, was not assisting his son to purchase the drug store, and signed purely for

accommodation of the bank, when assured he would not be obliged to pay.

It would serve no useful purpose to present the testimony at length. It is sufficient to say the sale of the drug store to Clayton Richardson was brought about by the president of the bank. The president said Paine was largely indebted to the bank, did not make a success of the drug store, the bank was likely to lose money on him, and they intended to get rid of him; it took no money to buy the drug store, the bank would finance the purchase, the store would pay it out, and all the bank wanted was interest and somebody to run the store. The cashier of the bank procured Clayton Richardson's signature to the original $8,000 note, saying he expected they had better be putting up a note or something to show how the check went through the bank for the store. Afterwards the president procured the signature of M. M. Richardson as a favor to the bank, because, on account of the limited capital of the bank, it could not lend that much to one man; it was an excess loan for the boy, and it would look better for the bank. When the original note was divided, the cashier told Clayton Richardson the doctors were going to take up the paper as soon as they could; Clayton's responsibility to the bank was not cut down, and he still owed the bank $8,000, the amount of the two notes; Clayton's father would not be held responsible, and they had his father sign a note and mortgage until they could take care of it themselves. The president procured M. M. Richardson's signature to the $4,000 note under the representation the bank examiner was hot after the bank on account of the $8,000 note, it had to be reduced, and the only way the president knew was to make two notes out of it. M. M. Richardson testified as follows:

"So I told him, I says, 'F. W., now supposing the boys can't make a go of this thing, you will have me stuck.' 'Why,' he says, 'Mote, as long as we have been friends, and you know Mr. Anderson, and as long as you have knew him, do you think we would defraud you in that manner?' He said, 'It is only to get by the bank examiner so we can carry this note through the bank here and the boys can have all the time they want;' and with that persuasion he came up and put his arm around my shoulder, and I consented to sign that mortgage."

In the course of some of the conversations the word "security" was used, and M. M. Richardson spoke of signing as security, but the testimony made it clear that M. M. Richardson was not furnish-

ing security for Clayton Richardson. What M. M. Richardson did he did to help the bank in the matter of the drug-store sale and its consequences, and not to help his son. It is this distinction which makes the cases cited by plaintiff inapplicable here. In *Stevens v. Inch,* 98 Kan. 306, 158 Pac. 43, Miss Inch, who was without funds, desired to purchase a millinery business. It was represented to her that if she gave her note it would hurt her credit. So to help her, her mother and brother gave a note. In *Bank v. Watson,* 99 Kan. 686, 163 Pac. 637, Blitz had borrowed from the bank all the money it could lend to one person. To help Blitz get more money, which the bank desired to lend, Watson gave his note. In *Bank v. Pirotte,* 107 Kan. 573, 193 Pac. 327, it was Peter Pirotte, and not the bank, who was accommodated when his mother signed his notes. In *Swan Savings Bank v. Snyder,* 124 Kan. 827, 262 Pac. 547, a borrower from the bank could not pay at maturity, and was requested to get security to obtain an extension. He and not the bank was accommodated when his mother signed the renewal note. These cases illustrate the principle involved, and it is not necessary to refer to others.

In this instance Clayton Richardson had all the credit he desired and needed without his father's help. The bank agreed to finance him, and did so. It permitted him to buy the drug store with a check on the bank, and then took his note for the amount of the check. Subsequently, for its own purposes, the bank needed M. M. Richardson's assistance to carry out the bank's drug-store scheme. The result is, the original and subsequent notes were given without consideration so far as M. M. Richardson was concerned, and for the benefit and accommodation of the bank. (*National Bank v. Williams,* 117 Kan. 501, 232 Pac. 252.)

There remains the question whether M. M. Richardson was forbidden to urge want of consideration. He was privileged to do so unless he intentionally and understandingly aided the bank officials in a scheme to deceive the bank commissioner concerning the true character of the paper which it held.

M. M. Richardson did not assist Clayton Richardson in obtaining or the bank in making the excess loan. Credit had been extended to Clayton Richardson, the money had been spent, and Clayton Richardson had given his note for it before M. M. Richardson was asked to sign. When he was asked to sign all he knew was the bank

was not able to lend that much money to one man, it was too much for Clayton to carry through the bank in his own name, and the bank could not handle it that way. All he intended was to help the bank carry the paper. An excess loan note was not taken out of the bank, and the note of a competent borrower substituted as a sound asset, as in the case of *State Bank v. Olson*, 116 Kan. 320, 226 Pac. 995. In that case the contested note was signed by a director of the bank. She was the wife of the cashier. Her purpose was to mislead the banking department. She intentionally participated in a transaction designed to deceive. In this case M. M. Richardson, janitor of the Hudson school building, was in effect requested to do a formal act recommended to him by the president of the bank as necessary to enable the bank to promote its interests and to provide a drug store which would pay itself out and be a credit to Hudson.

When the first note was divided "to get by the bank examiner," M. M. Richardson's comprehension of the transaction was that as a favor to an old friend he was helping the bank to comply with a requirement of the bank examiner. The jury made a special finding on the subject. The finding was, M. M. Richardson did not know and understand and intend that his note and mortgage would be placed among the assets of the bank and be passed on by the bank examiner as assets of the bank. He merely understood he was satisfying the bank examiner. The finding expresses a fair inference from the testimony.

The distinction to be made in cases of this character is quite like the distinction between fraud in law, which regards consequences only, and fraud in fact, which regards intention to deceive or defraud. The distinction was recognized in the case of *Holloway v. Gano*, 125 Kan. 3, 262 Pac. 573. In that case the defense that the note sued on was given to the payee without consideration and for its accommodation, was established against the receiver of a failed bank. Concerning accommodation of the bank the court said:

"It is not at all unreasonable for this accommodation to have been asked for and given to the bank. The bank was new and, as said by its president, could not well stand the loss of 70 per cent on the paper of Rust, occasioned by the bankruptcy proceedings. By the complicated deal it was reasonable to hope that the bank would ultimately collect the full 100 per cent, notwithstanding the bankruptcy proceedings." (p. 10.)

One of the issues in the case was whether the maker of the note knew and understood the note was executed and delivered for the

purpose of being placed in the bank as an asset and for the purpose of deceiving the directors of the bank and the banking department. It was argued in the brief for the receiver that as a business man the maker should have known the effect of his act. The court said that whether he did know and understand was the important thing, and it would not avail the receiver if the purpose (of the president of the bank who solicited execution of the note) was to deceive, but the maker did not know it.

Some special findings of the jury are criticized. The first special question was compound, and the answer responded to the portion relating to the bank's ownership of "any interest" in the drug store. The amount of Paine's indebtedness to the bank and his solvency were not matters on which the rights of the parties depended. They were important only as they bore on the question whether the bank desired to get rid of Paine, and it did desire to get rid of him. In answering the third special question the jury did not credit the testimony for the bank. If the answers to questions four and five were not strictly accurate, they were not far wrong. The tenth question, relating to how the bank was accommodated, was compound, and by its answer the jury doubtless intended to say the bank would be better secured by getting Paine out of the drug store and getting the Richardson boys in.

The foregoing disposes of the merits of the case. The questions involved were questions of fact: First, was the note given without consideration, to accommodate the bank? Second, did M. M. Richardson intentionally participate in a transaction with knowledge that its object and purpose were to falsify the assets of the bank and deceive the banking department? The verdict answering both questions in his favor was sustained by sufficient evidence.

The judgment of the district court is affirmed.