[L. A. No. 13905. In Bank.—July 31, 1935.]

CLYDE B. CAMERER, Respondent, v. CALIFORNIA SAVINGS & COMMERCIAL BANK OF SAN DIEGO (a Corporation) et al., Appellants.

Gray, Cary, Ames & Driscoll and Sullivan, Roche, Johnson & Barry for Appellants.

Whelan & Whelan and Stearns, Luce & Forward for Respondent.

THE COURT.—This case was transferred to this court upon plaintiff's petition for hearing after decision by the District Court of Appeal, Fourth District, reversing a judgment for plaintiff. Although we are of the view that the judgment for plaintiff must be affirmed, we hereby adopt as part of our opinion the statement of facts and certain conclusions based thereon, as they appear in the decision of the appellate court.

"Respondent instituted this action against appellants, and others, to recover possession of $45,500 par value of bonds and other securities, or their value if possession could not be had. Other relief was sought which it is not necessary that we consider here. Judgment was rendered against Edward Rainey, as Superintendent of Banks, for the recovery of the securities in his possession of the par value of $44,500, or their market value in the sum of $39,385, in case redelivery could not be made. The case against the California Savings & Commercial Bank of San Diego was ordered dismissed. We will hereafter refer to the California Savings & Commercial Bank of San Diego as the bank.

"I. I. Irwin was a banker with an experience of more than eighteen years in the city of San Diego. Respondent was a medical officer in the United States Navy, a friend and acquaintance of Irwin, and a depositor in the financial institutions with which he was connected.

"Irwin organized the California Savings & Commercial Bank of San Diego and became its president. He owned four

thousand one hundred twelve, out of a total issue of five thousand shares of its capital stock. He dictated the policies of the bank except during the last few months of its existence as a going concern. About the time of its organization he persuaded respondent to transfer his account to the bank and to purchase fifty shares of its capital stock.

"The California Safe Deposit Company of San Diego conducted a safe-deposit business in the basement beneath the bank. While it had a separate corporate entity, it was a subsidiary of the bank and was controlled by it. On November 5, 1927, respondent rented a safe-deposit box in which he kept his valuable papers. According to the signature card and rental agreement, C. B. Camerer, Mrs. C. B. Camerer, his wife, and I. I. Irwin were authorized to open the box. Respondent was frequently away from San Diego for considerable periods of time on duty with ships, at sea, or at hospitals in other localities. During such times Irwin, with the knowledge and consent of respondent, opened the safe-deposit box, clipped and collected the coupons and performed other services for him.

"The bank continuously lost money from the time it opened until it was closed. Either quarterly, or semi-annually, Irwin placed in the profit and loss account of the bank sufficient money to cover the loss of the period succeeding his prior payment so that no loss would appear on the books.

"Irwin began using respondent's bonds in the fall of 1927, and continued using them in 1928 and 1929 whenever the bank needed money to make up its deficit. In all but one of these transactions he described his actions as follows: 'A. Well, as far as my memory serves me, at each quarter the bank needed money to pay the deficit, and when that occurred I took these bonds and sold them to the bank and deposited this money to my account and gave the bank a check to pay on the profit-and-loss account. Later on, when I had money in my account, I took the bonds back, and later on I put them back again. That is my recollection of it. Q. Did some of the other officers of the bank know the nature of these transactions? A. I suppose so. . . . A. Those bonds were turned over to the official who had charge of the bonds, and he made out the statement and credited the amount to my account and charged the bonds to the bank's bond account. That's my recollection. Q. During this period that you were

speaking of, the bank was not making any profits, but, on the contrary, was losing money? A. Yes. Q. And needed the money at the end of each quarter to pay its running expenses? A. Yes. Q. And these bonds were simply manipulated in that way so that the bank would have money? A. Yes. . . . Q. Into which of the bank's accounts was that put? A. It was charged to my account and credited, as far as I know, to the profit-and-loss account of the bank. Q. Was the same thing done in regard to money ostensibly raised by the other negotiations with these bonds that you say were similarly sold to the bank? A. As far as I remember. Q. All went into the profit-and-loss account of the bank and it was needed for the running expense of the bank? A. Yes, sir.'

"Respondent at no time prior to the closing of the bank in July, 1930, had any knowledge that Irwin had sold any of his bonds or securities or used them as a pledge to secure payment of a promissory note to the bank, and prior to November 21, 1929, did not know that Irwin had removed any of the securities from the safe-deposit box.

"The 'sales' of respondent's securities to the bank were made by Irwin upon his express understanding with the other bank officials that they were to be kept separate from other securities owned by the bank; that the bank would not sell them; that Irwin would repurchase them when he could; that the coupons would be clipped and delivered to Mr. Irwin. Irwin repurchased all of the securities 'sold' to the bank prior to September, 1929, and returned them to the Camerer safe-deposit box.

"In the latter part of September, 1929, Irwin needed over $20,000 to make good the losses of the bank. He removed securities of the par value of $22,500 from the safe-deposit box of respondent and 'sold' them to the bank, at their market value, with the instructions we have outlined. These were never repurchased by Irwin, but, with the exception of one one-thousand-dollar bond which matured and was delivered to Irwin, remained in the possession of the bank and were taken over by the Superintendent of Banks when he closed it.

"In the latter part of November, 1929, respondent made an unexpected and hurried return to San Diego. Irwin contacted him and explained that he wanted to *rent* the use of

some of the securities. He explained to Camerer that the bank had ways of making profits from the securities in addition to their regular interest. Camerer consented and gave Irwin the securities he desired which were the same ones which Irwin had 'sold' to the bank in September, 1929. They were all in Camerer's safe-deposit box, though how, when or by whom they were taken from the bank safe and returned to the Camerer safe-deposit box is not explained. Irwin gave Camerer the following receipt and agreement:

" 'CALIFORNIA SAVINGS & COMMERCIAL BANK
of San Diego.

San Diego, California, Novemb. 21st 1929

Bonds borrowed

from C. B. Camerer
by I. I. Irwin

As follows:

| | | |
|---|---|---|
| $9,500.—Bryant Building Inc. | | 6½% |
| ''3,000.—Midland Counties Land Co. | | 7% |
| ''3,000.—Otis Steel Co. | | 6% |
| ''5,000.—Pickwick Corporation | | 7% |
| ''2,000.—Utilities L & P Corp. | | 5½% |

$22,500.—par value (Twenty Two Thousand Five Hundred Dollars)—As security for the return of said Bonds I hereby deposit with C. B. Camerer

59

Certificate No. /~~200~~ for two hundred (200) shares of the capital stock of the California Savings & Commercial Bank of San Diego to be redelivered to me upon the return by me to C. B. Camerer of the above Bonds.

¼% (one quarter of one per cent.) Premium as hire to be paid by I. I. Irwin to C. B. Camerer or $56/25 (Fifty six 25/100 Dollars) for each three months or less

" 'November 21 1929

" 'I. I. IRWIN.' "

"On December 31, 1929, the bank again needed funds to make up its deficit. Irwin had one of his employees execute a promissory note to the bank in the sum of $23,000, and

pledged $23,000 par value of respondent's securities for the payment of this note. The money was deposited to the credit of the employee, transferred to Irwin's account, then transferred to the profit and loss account of the bank. These securities are now in the possession of the Superintendent of Banks.

"On January 8, 1930, Irwin telephoned the residence of respondent. Respondent was not at home and Irwin explained to Mrs. Camerer that he could use more securities under the same arrangement as before. She communicated with her husband, who consented to the transaction. She went to the bank, opened the safe-deposit box where the exact securities which Irwin desired to use were reposing, delivered them to Irwin and took a receipt in substantially the same form as the one dated November 21, 1929. The securities were the identical ones pledged to the bank to secure the note of December 31, 1929. How they were returned to the safe-deposit box does not appear unless an explanation is offered in the testimony of Irwin that they might have been delivered to the bank after the date of the note.

"The trial court found that the bank was insolvent on July 23, 1930; that it had been taken over by the Superintendent of Banks on that day together with the Camerer securities of the par value of $44,500; that these securities have remained in the possession of the Superintendent of Banks; that Irwin, in September and December, 1929, had neither right nor authority to sell, transfer, pledge or convey any interest in the securities to the bank and that the purported sale and pledge were made without the knowledge or consent of Camerer; that the money derived from the 'sale' and pledge of the securities went into the funds and assets of the bank; that the receipt given by Irwin to Camerer on November 21, 1929, was given after the purported 'sale' to the bank of the same securities described in the receipt; that the same was true of the receipt dated January 8, 1930, for the securities pledged to the bank on December 31, 1929; that Camerer had no notice or knowledge of the sale or pledge of his securities until after the bank was closed on July 23, 1930; that all, or most of the securities so sold or pledged to the bank, were purchased by Camerer through the bank and this fact was known to the assistant cashier of the bank at the time of the purported 'sale' and pledge; that the two receipts for

the securities dated November 21, 1929, and January 8, 1930, and signed by Irwin individually were executed by him for and on behalf of and for the benefit of the bank; that all the interest coupons were detached from the securities while in the possession of the bank, delivered to Irwin or the agent of Camerer, and deposited in Camerer's personal account in the bank; that all of the 'sales' of the Camerer securities to the bank, and their pledge, between the fall of the year 1927 and January 9, 1930, were made by Irwin wrongfully, without any authority, and for the purpose of showing fictitious assets of the bank in order to deceive the Superintendent of Banks; that the bank had notice and knowledge through its officers that Irwin did not have title to the securities at the time of their 'sales' and pledge; that the bank received the benefit of the unlawful sale and pledge of the securities to it.

"All of the foregoing findings are supported by ample evidence or by reasonable inferences to be drawn from it.

"The trial court made the following finding: 'That in the transactions above referred to the said plaintiff acted in all respects as an ordinary, prudent person would act, having full confidence at all times in the integrity and honesty of the said defendant Irwin as president of the said California Savings & Commercial Bank of San Diego, . . . plaintiff was not negligent in accepting the receipts above referred to or in permitting the said California Savings & Commercial Bank of San Diego to borrow the said bonds and securities as represented by said receipts above referred to, and the said plaintiff was not negligent in any of the acts done or taken by him; and was not negligent in the omission of any acts whatsoever.' This finding is seriously assailed by appellants.

"It will shorten this opinion to state frankly that if the bank were not an insolvent institution with its assets in the possession of the Superintendent of Banks, but were a going concern, we would unhesitatingly affirm a judgment which would require the return to Camerer of the securities which had been taken from him by the dishonest acts of the president of the bank. We are unimpressed with the argument that the receipts signed by Irwin on November 21, 1929, and January 8, 1930, gave Irwin authority to sell or pledge the securities. The 'sale' occurred in September, 1929, two months before the first receipt was executed, and the pledge on December 31, 1929, a number of days before the second

receipt was signed and delivered to Camerer. He had no knowledge of a prior conversion of his securities. That a person cannot ratify the unauthorized act of another of which he has no knowledge is too elemental to need support of authority. We are equally unimpressed with the argument that the bank and its officers, other than Irwin, neither had, nor should have had, notice of the fraudulent character of the several transactions in which Irwin purported to 'sell' and pledge the securities. A large part, if not all of the securities, had been purchased for Camerer by the bank. The bank was not to dispose of any of them, but was to hold them for repurchase by Irwin. They were not to be placed among the securities owned by the bank, but were kept separate until a bank examiner ordered the practice discontinued a short time before the bank was closed. The coupons were clipped and delivered to Irwin, he giving his check to the bank for their face value. The coupons, or most of them, were deposited to Camerer's personal account. The 'sales' were known to be 'wash sales'. The signor of the note was known to be a 'dummy' and at least two officers of the bank objected to making the loan. All the transactions with the securities were made for the purpose of concealing the losses of the bank and deceiving the Superintendent of Banks as to its actual condition. Surely these and other facts which must have been known to the responsible officers of the bank should have caused them to inquire into the good faith of the transactions.''

The District Court of Appeal, after announcing the above conclusions, with which we are in accord, proceeded to hold that the facts presented called for the application of the principle that where one of two innocent persons must suffer, he who by his conduct has made possible the perpetration of the wrong should bear the loss. In the theory of the appellate court, Camerer, by entrusting possession of the bonds, which were payable to bearer, to Irwin or to the bank, under the hiring receipts described above, enabled Irwin to deceive the bank examiners by a fraudulent showing of assets, which was reflected in the statements of the bank's condition published periodically in the press, as required by law. As a result thereof the bank was held out to the public and to its depositors and creditors as a sound institution and kept open beyond the date when it otherwise would have been ordered

closed. If the bank had been closed at an earlier date, new deposits would not have been made, and existing depositors and creditors would have received a larger liquidating dividend than they will now receive. The District Court of Appeal expressly recognized in the portion of the opinion above quoted that the bank did not occupy the status of a holder in good faith of the bonds. But the appellate court was of the view that the defendant Superintendent of Banks, representing the creditors and depositors, could assert rights and defenses not available to the bank, and that in his capacity of receiver he was entitled to retain the bonds as assets for distribution to depositors and creditors. It was to examine this conclusion that we granted plaintiff Camerer's petition for transfer to this court.

Plaintiff Camerer contends that there is no evidence that the bank examiner, and, through him, the depositors and creditors were deceived by the manipulation of Camerer's securities, and no evidence that the bank would have been closed at an earlier date had the said securities not appeared as assets of the bank, nor evidence that if the bank had been closed at an earlier date the depositors and creditors would have received a large dividend. The substance of these contentions is that it is not shown that the depositors and creditors have in any way been prejudiced by the acts of Irwin in relation to the Camerer bonds, wherefore Camerer should not be estopped to require their return to him. Without discussing this matter in detail, it must be said that the whole evidence will support no reasonable inference but that the state banking authorities were in fact deceived by the fraudulent showing of assets, and by reason thereof the bank was permitted to continue doing business, receive new deposits and incur new obligations. As to existing creditors and depositors, the conclusion is inevitable that they will receive a smaller dividend than they would have received had the bank closed earlier. The officers of the bank testified that it never earned expenses since its establishment in 1927. We may take judicial notice that in the fall of 1929 there occurred the phenomenal crash in the stock market, which marked the onset of a long period of economic depression and steadily declining property values. In a bank which at the time of the crash was not earning expenses, and which never afterwards earned expenses, the value of assets for distribu-

tion to depositors and creditors decreased as the bank remained open. Although it appears that the depositors and creditors have been prejudiced through the bank remaining open, it is true that the record is devoid of proof to establish the extent to which they have been damaged. This question as to proof of damage will be discussed hereinafter.

■ Notwithstanding the depositors and creditors of the bank will suffer a loss, we are of the view that Camerer is not estopped to reclaim his bonds. No claim is made that Camerer colluded and connived with Irwin to deceive the bank examiner, or that he had guilty knowledge that Irwin desired to make a fraudulent showing of assets. The findings also negative defendant's contention that the circumstances connected with the ''hiring'' of Camerer's bonds were so unusual that he should have distrusted Irwin. The finding of the trial court, quoted above, was to the effect that plaintiff acted in all respects as an ordinarily prudent person would act, having full confidence at all times in the integrity and honesty of Irwin, and that plaintiff was not negligent in the acts done by him or in the omission of any acts. It cannot be said as a matter of law that the evidence compels the conclusion that plaintiff was chargeable with constructive notice of Irwin's fraudulent scheme. In this situation the finding of the trial court must stand.

The bank was not a purchaser in good faith of the Camerer bonds. Although the transaction was manipulated in such a manner as to make it appear that the bank had given value for the bonds, in truth, there was nothing more than a series of bookkeeping entries designed to simulate an honest transaction. In September, 1929, a credit to represent the purchase price paid by the bank for bonds owned by Camerer of the par value of $22,500 was credited Irwin, and he immediately caused his account to be debited in favor of the bank, with the result that the assets of the bank appeared to be increased by the value of the bonds without a corresponding increase in its liabilities. In the transaction involving the Snyder note, a credit to represent the proceeds of the note, secured by pledge of Camerer's bonds, was given Snyder, who transferred it to Irwin, and he immediately caused his account to be debited and a credit to be entered in the bank's profit and loss account, thereby increasing the assets without increasing the liabilities.

There is testimony of doubtful import as to the bank paying $54,000 to Irwin after January 8, 1930, to recompense him for securities transferred by him to the bank. But the evidence as to this payment and as to its being intended as a payment for the Camerer securities is doubtful and uncertain, and at any rate it would not place the bank in the position of a holder in due course, for the officers of the bank had actual knowledge of facts from which they must have inferred that Irwin was engaged in an unlawful and fraudulent scheme at the time of the transfer of the bonds to the bank. It would seem that Irwin later paid $70,000 to the bank to make restitution to persons whom he had defrauded, but no part of this sum was paid to Camerer, it being applied to obligations which the officers of the bank regarded as more pressing. ■ It is fundamental that a liquidating receiver represents the interests of depositors and creditors. It is equally fundamental that as a general rule, the receiver takes the insolvent's property subject to all liens, defenses and equities to which it is subject in the hands of the insolvent, and that he administers on behalf of creditors no greater title or estate than the debtor had. (22 Cal. Jur., pp. 437, 488, 492, 518, 521, citing cases; 53 C. J., pp. 99, 324, 344, citing cases; 23 R. C. L., pp. 117, 121, citing cases.) Without denying the validity of this general rule, there are certain situations where the receiver is permitted to assert rights and defenses not available to the insolvent. Thus, it is held that although the insolvent debtor cannot set aside a transfer in fraud of his creditors, as he is *in pari delicto,* the receiver acting for the creditors may attack it. (See 23 R. C. L., p. 116, citing cases.) It is also held that although an unrecorded conveyance or mortgage is valid as against the grantor or mortgagor, his receiver prevails over the holder under the unrecorded instrument under statutes which provide that unrecorded transfers are void as to creditors. (*Shooters Island Shipyard Co.* v. *Standard Shipbuilding Corp.,* 293 Fed. 706, 716; *In re K–T Sandwich Shoppe,* 34 Fed. (2d) 962.) The justice and equity of such exceptions to the general rule that the receiver has only the rights of the insolvent debtor are apparent.

There is a further exception within which defendant receiver contends the instant case lies. There are a considerable number of cases arising in the various jurisdictions in

this country where a receiver has brought suit upon a promissory note executed by the maker without consideration on the express understanding that it was to be used to make a fictitious showing of assets to the bank examiner, and thereafter to be returned to the maker, who was in no event to be held liable thereon. The bank which is *in pari delicto* with the maker, cannot recover on a note given for such a purpose, but if it passes into the control of a receiver as an insolvent institution recovery by the receiver is permitted. (*German-American Finance Corp.* v. *Merchants & Manufacturers State Bank,* 177 Minn. 529 [225 N. W. 891, 64 A. L. R. 582] ; *First Nat. Bank* v. *Boxley,* 129 Okl. 159 [264 Pac. 184, 64 A. L. R. 588] ; annotation, 64 A. L. R. 595, collecting cases; Brannan's Negotiable Instrument Law, 5th ed., p. 410; 28 Yale Law Jour. 823; 38 Harvard Law Rev. 239.)

In this state, acceptance of the above rule was indicated in *Bank of Orland* v. *Harlan,* 188 Cal. 413 [206 Pac. 75], and *First Nat. Bank of Reedley* v. *Reed,* 198 Cal. 252 [244 Pac. 368]. Both of these cases involved suits brought by the bank, which was denied recovery on the ground that it would be indefensible to permit it to profit by its own wrong, but this court expressed its opinion that had the bank become insolvent and suit been brought by a receiver recovery would be allowed. In the more recent case of *Wood* v. *Kennedy,* 117 Cal. App. 53 [3 Pac. (2d) 366], the superintendent of banks as receiver was plaintiff, and the court sustained his right to recover on a note used to make a fictitious showing of assets. In both *Bank of Orland* v. *Harlan, supra,* and *First Nat. Bank of Reedley* v. *Reed, supra,* the maker of the note knew that it was to be used to perpetuate a fraud under the banking laws. In *Wood* v. *Kennedy, supra,* the appellate court said that while upon the record it did not care definitely to hold that the maker of the note gave it to the bank to be used to fraudulently increase its assets, such a conclusion was logical. Had Camerer delivered or permitted his bonds to be delivered to the bank to be used to deceive the bank examiner, upon the authority of the above cases, defendant as receiver would be entitled to retain them. But the trial court's findings exonerate Camerer from connivance and collusion in the fraud and from negligence. In cases involving negotiable promissory notes it has been held that the receiver of a bank cannot recover on the note where the maker was not a party to the deceit

practiced on the bank examiner and was not aware that the note was to be used for an unlawful purpose. (*Shaw* v. *Korth*, (Tex. Civ. App.) 71 S. W. (2d) 332; *Browning* v. *Fuller*, 153 Va. 36 [149 S. E. 462]; *Baird* v. *Miller*, 56 N. D. 142 [216 N. W. 340]; *Hudson State Bank* v. *Richardson*, 128 Kan. 238 [276 Pac. 815]; *Grant County State Bank* v. *Schultz*, 178 Minn. 556 [228 N. W. 150]; *Crum* v. *Emmett*, 197 Iowa, 1160 [196 N. W. 982]; 2 Moss, Banks and Banking, p. 1597.)

Defendant receiver contends that although Camerer may not have been negligent in the sense that he should have mistrusted Irwin and anticipated an improper use of his bonds, nevertheless he had entrusted Irwin or the bank with possession and by the hiring receipts with authority to deal with the bonds, and this is sufficient to estop him from reclaiming the bonds. We are mindful of cases where an estoppel has been raised against the owner of indorsed certificates of stock or bearer bonds based on an entrustment of possession coupled with authority to deal in some manner with the securities, although the owner cannot be said to have been negligent in the sense that as a man of reasonable prudence he had cause to doubt the integrity of his agent. (*Powers* v. *Pacific Diesel Engine Co.*, 206 Cal. 334 [274 Pac. 512, 73 A. L. R. 1398]; *Lynch* v. *International Banking Corp.*, 68 Cal. App. 432 [229 Pac. 968]; *Grange* v. *Judah Boas Co.*, 60 Cal. App. 484 [213 Pac. 712]; 13 Cal. Law Rev. 251; 17 Cal. Law Rev. 403.) In such cases the owner is the victim of misplaced confidence, and can be said to be negligent only in the restricted sense that he has placed it within the power of his agent to accomplish a fraud. This doctrine is applied to protect *bona fide* purchasers and pledgees, and may also be invoked in other situations where equity and good conscience dictate. But we do not find that its application is indicated in the situation herein.

We have hitherto pointed out that it has been held in the promissory note cases that the receiver cannot recover where the maker was not a party to the fraud. ■ It follows from our previous discussion that although the receiver is in exceptional circumstances accorded rights denied to the insolvent, the receiver does not have the status of a *bona fide* purchaser for value. (53 C. J., p. 100; 23 R. C. L., p. 56, citing cases.) Banks commonly have in their lawful posses-

sion and under their control large quantities of securities, including indorsed stock certificates, bearer bonds and negotiable promissory notes, which they hold upon express trusts with broad powers to dispose of such securities and otherwise deal with them in administration of the trust. Should such securities be misappropriated to deceive the bank examiner by fraudulently showing them to be assets of the bank, it could not be successfully contended that because the bank had been entrusted with possession, together with power to deal with the securities, the receiver for the bank, as against the beneficiaries of the trust, could retain them as an asset for distribution to depositors and other creditors. It seems readily apparent that the rights of the beneficiaries of express trusts would be in equity and good conscience superior to the claims of the depositors and creditors, represented by the receiver.

As in the hypothetical case outlined above, so in the instant case, the property consists of bearer bonds. In said hypothetical case we have assumed broad powers in the bank as trustee to sell and exchange the securities in administration of the trust, but their use to make a fraudulent showing of bank assets is inconsistent with the powers granted or implied. Likewise in the instant case, whatever may have been the rights of Irwin or the bank under the so-called hiring agreements, the use of Camerer's bonds to deceive the banking authorities was not authorized. There is a question presented in the case herein as to whether the entrustment under the hiring agreements was to Irwin as an individual or to the bank. The testimony of Camerer indicates that he believed he was dealing with the bank. On the other hand the written receipts by which the agreement was reduced to written form tend to indicate that the entrustment was to Irwin, rather than to the bank. If the entrustment was to Irwin, the bank by reason of the guilty knowledge of its other officers became an involuntary trustee of the bonds for Camerer. And if the entrustment was directly to the bank, it, and after it the receiver, continued to hold the bonds for Camerer's benefit despite their fraudulent showing as assets of the bank, to which scheme Camerer was not a party. As in the hypothetical case of an express trust which we have assumed, so upon the facts of the instant case in equity and good con-

science Camerer's claim to the bonds is superior to that of the bank's depositors and other creditors.

■ Although the above analysis impels an affirmance of the judgment for the plaintiff, there is a further reason why the judgment should not be reversed if it be conceded, for purposes of argument, that an estoppel arose in favor of the receiver on the facts shown. The facts upon which an estoppel could be predicated did not arise as to the bonds of the par value of $22,500, the subject of fictitious sale to the bank in September, 1929, until November 21, 1929, when Camerer signed the hiring agreement relating to said bonds nor as to the balance of the bonds until January 8, 1930. On that date they were in Camerer's safe deposit box, although they then appeared in the bank's records as assets of the bank. Prior to the date when the hiring agreement was signed, and the bonds handed to Irwin in pursuance of said agreement, neither Irwin nor the bank had been entrusted with possession of Camerer's bonds nor with any power to deal with them. Irwin merely had been given access to Camerer's box to clip coupons during Camerer's absence and to place in the box new bonds bought by Camerer. The distinction between mere access and a real entrustment coupled with authority to deal in some manner with the property is well settled. It is held that mere access alone will not give rise to an estoppel. (*Crocker Nat. Bank* v. *Byrne & McDonnell*, 178 Cal. 329 [173 Pac. 752] ; *The Yamato* v. *Bank of Southern California*, 170 Cal. 351 [149 Pac. 826] ; *Kohn* v. *Sacramento Elec., Gas & Ry. Co.*, 168 Cal. 1 [141 Pac. 626].)

■ On the date of the hiring agreement the bank was already in an unsound condition. Indeed it was in such a condition in 1927 and 1928, when Irwin first commenced to manipulate Camerer's securities. If the bank had been ordered closed upon the rendering of the bank's report soon after the execution of the hiring agreement of November, 1929, as it would have been but for the deception practiced on the bank examiner, it is highly probable that the depositors and creditors would not have received payment of their claims in full. An estoppel based on entrustment, but without fraudulent connivance should not be enforced beyond the extent necessary to make good the loss suffered through the acts which form the basis of the estoppel. (See note, 38 Harvard Law Review, 239.) To assess damages in the case

herein, it would first be necessary to compute the dividend which the depositors would have received had the bank been closed on an earlier date and to then estimate the dividend they will receive as a result of the closing of the bank on July 23, 1930, when it in fact closed. The difference will then represent the loss to existing depositors resulting from the deception practiced on the bank examiner. If the securities of other owners besides Camerer were similarly manipulated they, *pro rata* with Camerer, would bear this loss, and to the extent not required to make good the loss, such securities should be returned to their owners. Conceding for purposes of argument only, that Camerer should be estopped on the facts shown, the evidence would not support a judgment for defendant receiver for the reason that he has failed to make a showing of the amount of damage.

Both respondent and appellant herein rely on our recent decision in *Verder* v. *American Loan Society*, 1 Cal. (2d) 17 [32 Pac. (2d) 1081], in support of the respective contentions. In that case plaintiff, upon request of the American Mortgage Company that a note for $10,000 owned by her and secured by deed of trust be brought in for payment, deposited said instruments with the mortgage company, which gave her a receipt that the note and deed of trust had been taken for collection. One Kundert, acting as a dummy for the mortgage company, executed a note and deed of trust, also for $10,000, in favor of the American Loan Society, which was recorded. After the deed of trust to the loan society had been recorded, the mortgage company presented plaintiff's note and deed of trust to the trustees named therein and procured from said trustee a reconveyance, which was also recorded, with the result that the Kundert deed of trust executed in favor of the loan society became a first lien, and plaintiff's prior lien became discharged of record. The mortgage company never paid plaintiff the amount due on her note, but from time to time put her off on the ground that it had not yet been collected. Both the loan society and the mortgage company passed into receivership. The loan society's deed of trust was foreclosed and it acquired title in fee.

Plaintiff brought action to set aside the reconveyance of her deed of trust, and establish its status as a first lien. The mortgage company and loan society had interlocking officers and directors. The court held that the knowledge of the

agents and officers of the mortgage company, who were also officers and agents of the loan society, made both corporations guilty participants in a conspiracy to defraud plaintiff, and decreed her deed of trust a first lien on the property described therein.

There, as here, it was urged that plaintiff was estopped to assert her claim against the receiver of the loan society, representing its depositors and creditors. The court held that the receiver could not prevail, first, because it could not be said that plaintiff in anywise was at fault or negligent in leaving her note and deed of trust with the mortgage company for collection. Secondly, the loss to creditors of the loan society by decreeing plaintiff's lien to be prior would not be direct, but consequential. The court further pointed out that it was not shown that the creditors and investors in the loan society became creditors after recordation of the fraudulent reconveyance of plaintiff's deed of trust, with the result that it did not appear that anyone had parted with value relying on the new deed of trust as a first lien.

In the instant case we think it must be presumed that in the period of seven months between the first hiring agreement and the closing of the bank, deposits were made in a bank in a city the size of San Diego, and, further, we have pointed out that existing depositors and creditors suffered through the bank being kept open, although defendants failed to prove the extent of their loss. But the other grounds of the court's decision support plaintiff Camerer herein.

In the Verder case it is stated that the rule permitting a liquidating receiver to claim certain rights and defenses not available to the insolvent corporation is applied to cases where the dealings of the insolvent are in fraud of the creditors' rights, or where the dealings are had directly between the third party claimant and the insolvent corporation. But such generalizations mean little except as applied to particular facts. In certain proper cases where the receiver has been permitted to assert defenses not available to the insolvent, it will be found that dealings were directly with the insolvent, or in fraud of the creditors' rights, but it does not follow that in all cases where either of these circumstances is present the receiver may assert rights not available to the insolvent in disregard of rules of law and equitable principles.

The judgment is affirmed.