No. 32,906

S. H. BARNHILL, WELLINGTON SOWERS and GEORGE D. HANNA, *Appellants*, v. D. W. OW, *Appellee*.

(67 P. 2d 546)

Opinion filed May 8, 1937.

*Ezra Branine, Alden E. Branine, Fred Ice,* all of Newton, and *K. M. Geddes,* of El Dorado, for the appellants.

*L. J. Bond,* of El Dorado, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action on a promissory note. Defendant prevailed, and plaintiffs appeal.

Defendant admitted execution and delivery of the note, but de-

fended on the ground the note was given without consideration, solely for the accommodation of the plaintiff payees and upon the representation he would not be required to pay the note or any part thereof. The answer further pleaded the representations made by the payees were fraudulent, untrue and false, and were made for the sole purpose of persuading and inducing him to execute the note, that he was induced to execute the note by reason of such representations and that he would not have done so except for the representations made. The answer also narrated the history and circumstances leading up to the execution of the note, the substance of which will be narrated in connection with the facts of the case. In the reply plaintiffs denied the material allegations of the answer and narrated their version of the circumstances leading to the execution and delivery of the note.

Defendant assumed the burden of proof. When he rested plaintiffs filed their separate demurrers to defendant's evidence and each requested an instructed verdict in his favor for an undivided one third of the amount sued for. These were overruled. Plaintiffs introduced their evidence and defendant introduced rebuttal evidence.

It may be well to state this action was tried June 24, 1935, and that plaintiff, George D. Hanna, is the son of George W. Hanna, one of the payees, who died before the commencement of this action.

The record discloses no objection to any instructions when given nor on motion for new trial, and the instructions are not included in the specifications of error. Plaintiffs contend the question of consideration, under the facts, was strictly one of law and should not have been submitted to the jury. They insist the facts and circumstances connected with the consolidation of the several banks, the order of the district court and the stipulations entered into disclosed consideration for the note.

All parties to this action, except plaintiff George D. Hanna, were officers and stockholders in the Kansas State Bank of El Dorado, organized about 1918. It became financially involved in 1924, and a new bank, the Security State Savings Bank, was organized. Defendant was an officer and stockholder in the former bank and paid his stockholder's liability in full. Plaintiffs Barnhill, Sowers and George W. Hanna, father of plaintiff George D. Hanna, became officers and stockholders in the Security Bank. In 1927 the latter bank also had financial difficulties. It was consolidated with the

Walnut Valley State Bank, which assumed certain of the liabilities of the Security Bank and received its assets. Defendant was not an officer, director or stockholder in either of the last two banks. There were certain claims and liabilities of the Kansas State Bank which the Security Bank did not assume. A depositors' committee of the Kansas State Bank, consisting of Sowers, Barnhill and George W. Hanna, was required under a district court order dealing with the consolidation to advance a certain amount of money to pay claims which were not assumed by the Security Bank. A special deposit in the sum of $25,000 had also been made by certain directors of the old State Bank for the purpose of assisting that bank and preventing its capital from becoming impaired before the bank commissioner had found that bank to be insolvent. The order of the district court covering those two items provided:

"The court further orders that the above assets are to be conveyed, and assigned to the Security State Savings Bank of El Dorado upon the agreement of the Security State Savings Bank of El Dorado to assume certain liabilities of the Kansas State Bank of El Dorado which are set out on page 2 of this order, and upon the agreement of the stockholders' committee, to wit: W. Sowers, S. H. Barnhill and George W. Hanna, to advance money to pay the claims and liabilities of the Kansas State Bank of El Dorado, Kansas, which are not assumed by the Security State Savings Bank and which are set out in 'exhibit B' of this order, and take an assignment of such claims which the above-named stockholders' committee agree to hold until the receiver had sufficient funds collected out of the double liability and other assets to pay same. Said stockholders' committee to be allowed interest at the rate of 6 percent on all money advanced to pay such claims. Said assets to be conveyed and assigned to the Security State Savings Bank upon the further agreement of the stockholders' committee to guarantee to the receiver of the Kansas State Bank of El Dorado that money will be advanced to pay the special deposit in the sum of $25,000 above referred to, said special deposit not to be paid, however, until all other depositors and creditors have been paid in full, and until after one year from the date of this order, said stockholders' committee to be reimbursed for any money advanced to pay said special deposit out of any funds collected out of the double liability and other assets by the receiver after all other creditors have been fully satisfied."

To guarantee the performance of these and other provisions of the court's order, which other provisions are not stressed on this appeal, the depositors' committee was required to execute a bond in the sum of $50,000. The bond was signed by the three members of that committee heretofore mentioned and was signed by defendant and two others as sureties only.

When the Security Bank in turn encountered difficulties in 1927,

a written contract was entered into whereby its assets were transferred to the Walnut Valley State Bank, which latter bank assumed the liabilities of the Security Bank. The terms of this contract were likewise guaranteed by the plaintiffs Barnhill and Sowers, and by George W. Hanna, father of plaintiff George D. Hanna. The defendant was not a party to that contract, either as principal or as surety. Among the assets transferred to the Walnut Valley State Bank was a balance of $12,600, due the Security Bank, from the Kansas State Bank, payment of which had been guaranteed by Barnhill, Sowers and George W. Hanna, under the bond previously mentioned. The assets held by these guarantors in order to protect them on the bond were likewise delivered to the Walnut Valley State Bank. It appears the terms of the last contract were not consummated within two years as contemplated. On May 17, 1930, an extension agreement was entered into between the last two banks mentioned and Barnhill, Sowers, George W. Hanna, and others. It is at this time that defendant first became a maker of any note. In this last contract Barnhill, Sowers and George W. Hanna agreed that defendant would sign a note for $12,600 to the Walnut Valley State Bank, although defendant was not a party to that contract. On the date of this contract defendant did execute with Barnhill, Sowers and Hanna two notes payable to the Walnut Valley State Bank, one being in the sum of $7,500, the other in the sum of $5,100, totaling $12,600. It was on this occasion that defendant claimed he was advised by George W. Hanna that he would never be required to pay any part of the notes, that his signature was a mere accommodation, and that Mr. Tanner (secretary of the Walnut Valley State Bank) was insisting upon his signature. This representation was not made in the immediate presence of Barnhill or Sowers and there was no direct evidence they heard the conversation. At the time of trial George W. Hanna was dead. There was no testimony which contradicted this testimony of defendant, and it was corroborated. The conversation was alleged to have occurred in the lobby of the Walnut Valley Bank. The notes were signed in the directors' room, in the presence of Barnhill, Sowers and George W. Hanna. Lee Ow, a son of defendant, testified in substance: He was present in the bank the evening his father signed the notes; in endeavoring to secure the liquidation between the Walnut Valley Bank and the Security State Bank, there was a difference of property and some $12,600 still needed

to be raised, and it ended with Mr. Tanner of the Walnut Valley Bank requesting a note for the difference; Barnhill, Sowers and George W. Hanna were willing to sign the note, but Tanner requested somebody else, and Mr. Hanna requested him to go and get his father; Mr. Hanna told his father Mr. Tanner requested that he sign the note, and Mr. Hanna assured him (father) there would be no liability as there were ample assets to pay the note; the two notes equaling $12,600 were then signed by Hanna, Barnhill, Sowers and his father; there were five or six others in the directors' room when the notes were signed.

These notes, totaling $12,600, executed by Barnhill, Sowers, George W. Hanna and defendant, were renewed by the signers from time to time. Payments were made until the obligation was reduced to $6,000.

Defendant owed the bank on a strictly personal obligation, and his combined indebtedness constituted an excess loan. For this reason his signature was thereafter omitted from the joint note and renewals thereof to the bank. Instead of signing the joint note which was made payable to the bank he executed the note sued upon in the sum of $3,259.72, and made it payable to Barnhill, Sowers and George W. Hanna. It was endorsed in blank by the payees and deposited as collateral to their note of $6,000, and to later notes of reduced balances. The amount of defendant's note was exactly one fourth of the sum of $12,600 previously mentioned, plus interest. Defendant paid no part of the principal or interest on the $6,000 note nor on any renewals thereof for reduced balances. It appears he was never requested to do so until the month of June in 1932. The pertinent portion of defendant's testimony on the subject of accommodation was as follows:

"I saw George W. Hanna in the Walnut Valley State Bank at a time when I signed a note to him, or to the bank. I do not remember the exact date. Lee came to the house after me, and took me down to the bank. Mr. Hanna said he wanted me to sign a note. I said, 'Well, I don't want to sign any note.' I said, 'Well, I don't want to sign any note.' I said, 'What for?' He said that Tanner wanted me to sign this note to go as collateral security with other notes that these fellows had there. I said, 'Why? it is nothing to me. I don't care to sign it.' He said it was an accommodation to him for me to sign this note, and he said, 'There is nothing to do except Mr. Tanner wants it and there is plenty of assets of the bank so that you will never have to pay anything. You won't lose anything. It won't cost you anything. You will never have to pay it.'

"I did not arrive at the amount of the note sued on in this action dated

January 19, 1931, in the amount of $3,259.72, due 60 days after date, payable to S. H. Barnhill, W. Sowers and George W. Hanna. Mr. George W. Hanna made out that note, and said it was requested by Mr. Tanner, and asked me to sign it. I signed it and he assured me that I would never have anything to pay, that there were plenty assets remaining to pay all obligations. I knew nothing about it, only what Mr. Hanna told me. I can't remember whether the conversation about the security being sufficient was at the time I signed the $12,600 note. I have been assured every time I signed any note that there was ample security or assets to take care of everything.

"The conversation when Lee came up to the house to get me was at the time I signed this note. I did not know at the time I signed the $3,259.72 note that it represented one-fourth of the principal and interest on the $12,600 note from their date to January 19.

"I remember having a conversation with Mr. Barnhill, Mr. Sowers and George D. Hanna about this note sued on. They came down to my store. I did not tell them I did not have the money to pay them, or that I would give them a mortgage on some houses. I said I didn't owe the note, and that I wasn't going to pay it. I don't remember of ever telling Mr. Sowers, Mr. Barnhill and Hanna that I should have paid this note instead of paying some obligations down at Wichita. When I signed the two notes for $12,600 and the $3,259.00 note I was assured there was sufficient assets to pay the notes off, and they said there would be sufficient assets to pay off the notes, and that there would be property left and that the property would go back to the stockholders of the Kansas State Bank.

"I gave this note because Mr. George W. Hanna asked me to accommodate him."

It appears the $6,000 note was finally reduced to the principal sum of $5,473.82. It is admitted by defendant that on the payment by plaintiffs of the balance of this $6,000 note, defendant's note here involved was delivered by the bank to plaintiffs. Concerning the delivery of this note, it was stipulated early in the trial as follows:

"It is hereby stipulated and agreed between the plaintiffs and their attorneys and the defendant and his attorney that the ownership of the note in question, being a note in the amount of $3,259.72, dated January 19, 1931, is in the name of George W. Hanna, owned by George D. Hanna, S. H. Barnhill and Wellington Sowers; that the interest acquired in the note by plaintiff George D. Hanna was for valuable consideration after maturity, and delivery of the note was made by the Walnut Valley State Bank after maturity for consideration to George D. Hanna, Wellington Sowers and S. H. Barnhill."

C. C. Zimmerman, called as a witness on behalf of defendant, testified:

"When they (referring to plaintiffs) paid the remainder of the $12,600 notes, I think all of the assets of the Kansas State Bank, or the Security State Savings Bank, remaining were turned over to Barnhill, Hanna and Sowers. Mr. Ow did not get any of the assets to my knowledge."

The foregoing is the substance of the pertinent portions of defendant's evidence touching the question of want of consideration and accommodation maker. To this evidence, as stated, plaintiffs demurred, and also moved for an instructed verdict, which demurrer and motion were overruled. Plaintiff's evidence was comparatively brief. The substance of the pertinent portion thereof was: In June of 1932 they were preparing to pay the balance of the $6,000 note and interviewed defendant at his grocery store concerning the payment of the note in controversy; that defendant stated he was then unable to pay, but if Mr. Tanner (cashier of the Walnut Valley Bank) would extend the note he would give him a mortgage on some of his property. Plaintiff George D. Hanna on cross-examination admitted having had a previous conversation with the defendant in which the following statements were made:

"In that conversation Mr. Ow told me that my father told him he would never have to pay any part of this note. I made the statement that my father told me whatever the Deacon (meaning defendant Ow) said was all right."

In this conversation the plaintiff Hanna also stated:

"I had purchased this note from my father."

Defendant on rebuttal testified: "I never at any time said I would give a mortgage. I said that I didn't owe that note and that I wouldn't pay it." Lee Ow, defendant's son, testified on rebuttal concerning this particular evidence of plaintiff: "I don't remember that any such conversation as they testified to took place."

Was the demurrer properly overruled? Plaintiffs first urge that the original bond given by the depositors' committee saved the directors and officers of the old Kansas State Bank, of which defendant was one, from a civil liability on account of *possible* mismanagement of the bank. The contention at best is highly conjectural. If in fact true, there is not the slightest evidence before us to sustain the contention. The bond speaks for itself. Under its provisions defendant's liability as a surety was only secondary. That liability, in the event of default by the principals, was to the Kansas State Bank of El Dorado and to no other.

Plaintiffs further contend the stipulation relative to the transfer of the note sued upon, from the bank to them, admits consideration. It admits consideration from plaintiffs to the bank, but it in no way admits *defendant* received valuable or other consideration for the note sued upon.

Defendant assumed the burden of proof on the question of consideration and accommodation maker. His testimony disclosed he received nothing for his signature on this or any other notes connected with this transaction. Certainly his signature in no way caused a loss, detriment or inconvenience to the payees. Plaintiffs, however, contend if defendant was in fact an accommodation maker, it did not relieve him of liability on this note, as the stipulation disclosed they obtained it for a consideration. G. S. 1935, 52-306, provides:

"An accommodation party is one who has signed the instrument as maker, drawer, acceptor or endorser without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party."

Does this statute and stipulation make defendant liable to the two plaintiffs, Barnhill and Sowers, *original payees*, if it be true that defendant was in fact an accommodation maker for them and if these payees knew him to be such? We shall first discuss only the question of defendant's liability to these two plaintiffs. They insist defendant's evidence only disclosed that George W. Hanna told defendant he would not be obliged to pay any part of the notes he signed, and not that these two plaintiffs so advised him. True, the testimony of defendant and his son showed that only George W. Hanna talked to defendant about his signature. There is no direct evidence these two plaintiffs heard the conversation. It occurred in the lobby of the bank. It is necessary, however, to consider the entire situation. Sowers and Hanna were in the bank at that very moment awaiting the arrival of defendant. They had been in conference with Tanner, the cashier of the Walnut Valley Bank. The discussion pertained to the signatures on the notes totaling $12,600. These two plaintiffs and George W. Hanna were ready to sign, but Tanner demanded, in addition to their signatures, the signature of the defendant. According to the evidence, defendant, up to that moment, at least, had been liable to the Walnut Valley Bank for no part of the $12,600, either primarily or secondarily. It must be remembered, however, that Barnhill, Sowers, George W. Hanna and others had contracted with Tanner's bank that they would get the defendant to sign these notes with them. Defendant was not a party to the contract. These plaintiffs, however, were obligated by their contract to get defendant's signature on their notes. Tanner

was holding these men to their contract. Defendant was brought to the bank. The conversation with defendant was conducted by his old friend, George W. Hanna. The conversation which ensued has been related. Now, what did the evidence disclose as to whether defendant received any consideration for signing any of these notes or renewals thereof? It disclosed he had received absolutely nothing. There was no evidence to the contrary. Certainly, whether under all these circumstances the plaintiffs Barnhill and Sowers knew defendant was a mere accommodation maker, was a question of fact for the jury. That was a very vital issue in this particular lawsuit in view of the fact that Barnhill and Sowers were both original payees of the particular note sued upon, which they endorsed to the bank and from which bank they later received it. In *Toll v. Monitor Binding & Printing Co.*, 26 F. 2d 51, it was said:

"A *payee* of the note, who participates in any infirmity thereof, cannot escape result of such infirmity by endorsing note to a bona fide holder from whom he may subsequently purchase it back." (Headnote ¶ 13.) (Italics inserted.)

In the Toll case, *supra*, defendant was an accommodation maker. Plaintiff was not a payee, but had received the note by endorsement from the payee. In that respect the Toll case differed fundamentally from the instant case. Plaintiff prevailed, and the defendant, accommodation maker, appealed. The decision of the lower court was affirmed. In discussing defendant's contention in that case the court clearly stated a well-established principle which is applicable to the status of Barnhill and Sowers as original payees. It was said:

"Confusion, we think, has arisen in this case because of the attempt to apply to the facts here the well-established doctrine that a payee of a note who participated in any infirmity thereof cannot escape the result of such infirmity by endorsing the note to a bona fide holder from whom he may subsequently purchase it back. That would be fraud, and there is no claim of fraud in this case. We quote from 8 C. J. 685:

"'This rule (regarding holder taking from a bona fide holder) does not apply, however, where a payee repurchases a bill or note from a bona fide holder; and a holder with notice cannot purge a note of a defense known to him at the time of its transfer to him by merely assigning it to a third person and thereafter obtaining a retransfer.' (Daniel on Negotiable Instruments, § 805; 7 Cyc. pp. 938, 939, 940; *Horan v. Mason*, 141 App. Div. 89, 125 N. Y. S. 668; *Underwood v. Fosha*, 96 Kan. 240, 150 Pac. 571.)" (p. 56.)

Furthermore, in the instant case, unlike the Toll case, fraud was expressly pleaded against the payees in the procurement of the note. That issue was also for the jury and it inheres in the general verdict. In the Underwood case, *supra*, cited in the Toll case, we said:

"Of course, if the note should come back into the hands of the original payee, or an assignee under him who had notice of the equitable defenses and who had owned it before it passed into the hands of an innocent holder, the original equitable defenses could be maintained." (p. 245.)

See, also, *Collis v. Kraft,* 118 Kan. 531, 235 Pac. 862.

There was ample evidence to take the case to the jury on the question of whether defendant was an accommodation maker and whether Barnhill and Sowers knew him to be such. In the general verdict inheres the finding defendant was an accommodation maker for the payees and that they knew it to be a fact. In the case of *Durham State Bank v. Wolf,* 142 Kan. 775, 51 P. 2d 980, it was said:

"It is elemental that the accommodated party to a promissory note cannot recover from the party accommodating him. (*Means v. Bank,* 97 Kan. 748, 156 Pac. 701; *Bank v. Watson,* 99 Kan. 686, 163 Pac. 637; *National Bank v. Williams,* 117 Kan. 501, 232 Pac. 252; *Hudson State Bank v. Richardson,* 128 Kan. 238, 276 Pac. 815; *Farmers State Bank v. Montgomery,* 129 Kan. 203, 282 Pac. 741; *Walker v. Reese,* 131 Kan. 200, 289 Pac. 425; *Lutz v. Peoples State Bank,* 135 Kan. 115, 9 P. 2d 997.) The accommodating party is liable only to a holder for value. (R. S. 52-306; *Security Nat'l Bank v. West,* 120 Kan. 434, 243 Pac. 1014.)" (p. 777.)

The plaintiffs Barnhill and Sowers parted with nothing of value to obtain the signature of defendant on their notes; his signature cost them no loss, detriment or inconvenience, but merely accommodated them, and as original payees of defendant's note, which they used as security for their own obligation, defendant owes them nothing. The demurrer, as to them, was properly overruled, and they were not entitled to a directed verdict. As heretofore stated, there was no objection to instructions when given, none were made on motion for new trial and the verdict as to plaintiffs Barnhill and Sowers must stand.

Did the trial court err in overruling the demurrer of the third plaintiff, George D. Hanna, who was not an original payee, and for whose accommodation the note was not made? Plaintiff insists the stipulation required a ruling sustaining his demurrer. The contention is based on the following provision in the quoted stipulation: "That the interest acquired in the note by plaintiff George D. Hanna was for a valuable consideration after maturity . . ." George D. Hanna contends that even though he purchased after maturity, and even if it was an accommodation note, still he acquired good title and defendant was liable to him for a one-third interest in the note. In support of his contention he relies largely on the Toll case.

The status of plaintiff George D. Hanna in the instant case is decidedly dissimilar to that of the plaintiff in the Toll case. In that case plaintiff originally acquired title for valuable consideration from the payee. Plaintiff then negotiated the note before maturity to a bank and received the money thereon. Upon its maturity the bank attempted to collect the note. When the maker failed to pay the plaintiff took the note back from the bank after maturity and commenced suit against Toll, the accommodation maker. On this particular phase of that case it was said:

"Where bank was bona fide holder of note before maturity for value, party taking note from bank after maturity could recover against accommodation endorser, even though it had known of accommodation endorsement." (Headnote, ¶ 12.)

Now, in the Toll case there was only one note involved. In that case the bank, had it chosen to do so, could have sued the accommodation maker at the time it returned the note to plaintiff. The opinion in the Toll case quoted from our own decision in the Underwood case, *supra*, as follows:

"Since the innocent holder could collect from the maker, it can make no difference to the maker into whose hands the note may pass." (p. 56.)

The suit in the instant case involves a note which the bank held as collateral to another note on which Barnhill, Sowers and George W. Hanna were the makers. The bank could not have collected from the maker of the collateral note after the principal note was paid. The note sued upon, being a collateral note, had spent its force, insofar as the bank was concerned, when the principal note was paid. The note which the bank delivered to the plaintiffs on November 23, 1933, was not payable to the bank. It was executed by defendant on June 19, 1931, and was made payable to Barnhill, Sowers and George W. Hanna sixty days after date, and was held by the bank as collateral for their principal note. This collateral note, although payable sixty days after date, was never renewed in a period of almost three years, and was held by the bank as collateral until November 23, 1933. When the collateral note had spent its force the bank had no further title or interest therein. There remained only a duty for the bank to perform, and that was to surrender it to the parties to whom the note was made payable and who had deposited it with the bank as collateral. Those parties were Barnhill, Sowers and George W. Hanna, and not George D. Hanna. While George W. Hanna was dead at the time of suit, there

is no contention he was not living when the bank surrendered the collateral. At any rate, the bank at that time had no title or interest to sell. It must be remembered the question here is not whether the bank could have sold the note and collateral to some third party prior to the payment of the principal note. That was not done. The collateral was delivered to the plaintiffs after the principal note had been retired. The record discloses no endorsement of the note by the bank to plaintiffs. In the Toll case, it was further said:

"After maturity, the note is *not negotiable,* but is subject to *assignment,* and a transferee of a bona fide purchaser for value before maturity takes the same rights in the note as the transferor had, no matter if assignment is made after maturity. *The title secured is as good but no better than the transferor had.* (Citations.)" (p. 56.) (Italics inserted.)

On this question it is well to note several provisions of our law of negotiable instruments. G. S. 1935, 52-507, fixes the right of a holder in due course. It reads:

"A holder in due course holds the instrument free from any defect of title of prior parties and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

Who is a holder in due course? G. S. 1935, 52-502, provides:

"A holder in due course is a holder who had taken the instrument under the following conditions: (1) That it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

George D. Hanna was not a holder in due course. Defendant's evidence disclosed George D. Hanna acquired the note long after maturity, and had previously, in June or July of 1932, acquired actual knowledge direct from defendant that defendant claimed he did not owe the note and that he positively would not pay it. On demurrer this evidence must, of course, be accepted as an established fact. Defendant's evidence showed the note was several years past due. It further disclosed it was not negotiated to plaintiffs. Whether George D. Hanna took the note in good faith from the bank was a question for the jury. George D. Hanna, not being a holder in due course, to what defenses was the note subject in his hands and what rights did he acquire from his transferor? G. S. 1935, 52-508, provides:

"In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were nonnegotiable; but a holder who derives his title through a holder in due course, and who is not himself a party to any fraud or illegality affecting the instrument, has all the rights of such *former holder in respect of all parties prior to the latter.*" (Italics inserted.)

This note in the instant case was not made payable "to bearer" but "to order." It was not endorsed by the bank as required by G. S. 1935, 52-401, 52-402, and George D. Hanna acquired no better title in the note than the bank had. (G. S. 1935, 52-420.) The former holder, the bank, as we have shown, could not have recovered from defendant at the time it delivered the note to plaintiffs. From what has been stated, it follows the separate demurrer of George D. Hanna and his motion for a directed verdict were likewise properly overruled.

When George D. Hanna took the witness stand he testified: "I had purchased the note from my father." George D. Hanna now for the first time contends this part of his evidence was in conflict with the stipulation and that the trial court should not have instructed on the theory he obtained title to his interest in the note from his father. No objection was interposed to this statement by any of the parties as being in conflict with the stipulation or for any other reason. No request was made to have this testimony stricken or to have the court instruct the jury not to consider it. Plaintiff Hanna may have thought he needed it to show acquisition of title. In any event, this testimony remained in the record and the court instructed the jury on the theory of the stipulation as well as on the evidence that George D. Hanna had purchased the note from his father. As stated, no objection was made to this or any other instruction when given. None was made on the motion for new trial. Under these circumstances the question of the correctness of instructions is not before us for review. It follows the judgment must be affirmed. It is so ordered.