**David J. FINE, as he is Receiver of Bradford C. Bleidt and Allocation Plus Asset Management Co., et al., Plaintiffs,**

v.

**SOVEREIGN BANK, Defendant.**

**Civil Action No. 06CV11450–NG.**

United States District Court,
D. Massachusetts.

Aug. 8, 2008.

David J. Fine, Law Offices of David J. Fine, Boston, MA, pro se.

Melanie L. Oxhorn, New York, NY, for Plaintiffs.

Patrick T. Voke, Daniel J. Blake, LeClairRyan, P.C., Paul G. Boylan, LeClairRyan, A Professional Corporation, Michele T. Perillo, U.S. Securities & Exchange Commission, Boston, MA, for Defendant.

## ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

GERTNER, District Judge.

Over some twenty years, Bradford Bleidt ("Bleidt") swindled his business and his clients out of tens of millions of dollars. This litigation arises from the aftermath of the fraud. With few other targets for recovery, the receiver for Bleidt's wholly-owned company and his former clients have joined forces to seek to place some of the blame for the fraud on defendant Sovereign Bank ("defendant" or "Sovereign"). The plaintiffs have moved for summary judgment. For the reasons explained below, the Motion for Summary Judgment (document # 133) is **DENIED in part and RESERVED in part.**

The receiver, David J. Fine ("the receiver"), represents Bleidt's former company, Allocation Plus Asset Management, Inc. ("APAM"). He is joined in this suit by Nancy and Langdon Lombard, Donna Brandt Lawrence, and Bessie Panos, each of whom lost money when they gave Bleidt funds to be invested. These individuals, referred to herein as "the individual plaintiffs" or "the investor-clients," seek to represent a class of all similarly situated persons.

The receiver and the named plaintiffs each assert three separate theories of liability.[1] First, they argue that Sovereign aided and abetted Bleidt's breaches of the fiduciary duties he owed to APAM (as its agent) and to the investor-clients (as their investment advisor). To prove the claim, the plaintiffs must show that Sovereign knew of the breaches and that it actively participated in or substantially assisted them. *See Arcidi v. Nat'l Assoc. of Government Employees, Inc.*, 447 Mass. 616, 623–24, 856 N.E.2d 167 (2006).

Second, the plaintiffs argue that the bank negligently permitted Bleidt to evade

---

**1.** The plaintiffs also assert that Sovereign used unfair and deceptive business practices, but that issue is not appropriate for resolution on summary judgment for the reasons discussed below. The Court will address those claims, brought under Massachusetts General Laws ch. 93A, after trial if necessary.

detection by the SEC and negligently processed transactions beyond his authority. As discussed below, the contours of the plaintiffs' negligence claims are less clear, but it seems certain that they also require the plaintiffs to prove that the bank knew of Bleidt's fraud. *See Schlichte v. Granite Sav. Bank,* 40 Mass.App.Ct. 179, 181, 662 N.E.2d 238 (1996) (discussing bank's duties in negligence to depositors, and requiring actual knowledge of the breach); *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 287–90 (2d Cir.2006) (discussing bank's duties in negligence to third-party non-customers under New York law, and requiring notice of the breach).

Third, the plaintiffs claim that Sovereign committed conversion by taking financial instruments with notice of Bleidt's breaches of fiduciary duty. To make out the claim, the plaintiffs must show that Sovereign intentionally exercised control over property to which it had no right. Sovereign, however, may be able to assert defenses such as Bleidt's apparent authority to sign the checks and its status as a holder in due course. To rebut those defenses, the plaintiffs are required to prove that Sovereign had notice of Bleidt's breach of fiduciary duty. *See* Mass. Gen. Laws ch. 106, § 3–307.

This case involves two distinct sets of plaintiffs: the receiver and the individual investor-clients. They are not identically situated. For example, Bleidt may have owed different fiduciary duties when acting as APAM's agent than he did when acting as the investor-clients' investment advisor. And since APAM was a depositor at Sovereign Bank, the defendant may have owed it a different duty of care than the one it owed to the investor clients— none of whom were customers at Sovereign. Though the parties have not distinguished sharply between the two, the Court finds it useful to do so. After reciting the background of the case, the Court will briefly address the claims by the investor-clients before turning to those of the receiver, who represents APAM.

## I. BACKGROUND

### A. Facts

The Court takes all the facts in the light most favorable to Sovereign, the non-moving party. Fed.R.Civ.P. 56(c); *Mariasch v. Gillette Co.,* 521 F.3d 68, 71 (1st Cir. 2008).

#### 1. Bleidt's Fraud Generally and the Ensuing Litigation

In January 1991,[2] Bleidt became a registered representative of Commonwealth Equity Services, LLP ("Commonwealth"), a brokerdealer.[3] *See* Bleidt Dep. at 30, Ex. 1 to Voke Aff. (document # 158). He operated an investment advisory firm, Allocation Plus Asset Management Company, Inc. ("APAM"), of which he was the sole shareholder and sole director. Def. Resp. Pl. Stmt. Material Facts ("Def. Stmt. Facts") at 5 (document # 157); Pl. Stmt. Material Facts ("Pl. Stmt. Facts")

---

**2.** Bleidt's pattern of fraud began earlier, in approximately 1986, *see* Bleidt Dep. at 17, 32, Ex. 1 to Voke Aff. (document # 158), but that time period is not relevant to this litigation.

**3.** The Court uses Commonwealth as an example; some of Bleidt's fraud involved other broker-dealers. Bleidt switched his affiliation to Detwiler, Mitchell, Fenton & Graves, Inc. in October 2001, then to Winslow, Evans & Crocker, Inc. in February 2004. *See* Order Instituting Administrative Proceedings, Making Findings, and Imposing Remedial Sanctions, *In re Commonwealth Equity Servs.,* Exchange Act Release No. 56,362, 2007 WL 3071391 (Sept. 6, 2007). After discovering Bleidt's fraud, the Securities and Exchange Commission ("SEC") instituted administrative proceedings against Commonwealth and Detwiler Mitchell. *See id.* Those proceedings are not relevant to this litigation.

¶ 6 (document # 136). Bleidt acted as an intermediary between APAM's investor-clients and Commonwealth. He established accounts at Commonwealth for most of his clients. *See* Bleidt Dep. at 41, Ex. 1 to Voke Aff. (document # 158). Bleidt claimed to offer his clients investments like a "special mutual fund that particularly fit[ ] the economic climate," *id.* at 37, and purportedly directed their investments at Commonwealth accordingly. Indeed, he represented to his clients that when they wrote APAM a check, they could consider it invested with Commonwealth. *Id.* at 40–41. His clients believed APAM was a real investment firm. It was not.

In reality, Bleidt's business was a Ponzi scheme. Bleidt Confession Tape 1, Ex. 7 to Voke Aff. (document # 158) (so describing it). He convinced APAM's investor-clients to give him money under the false pretenses that he would invest it on their behalf, then misappropriated it.[4] As explained below, some checks Bleidt received were drawn by an investor-client, payable to APAM; some were drawn by a third party, payable to an investor-client and endorsed to APAM.[5] Bleidt maintained enough liquidity in APAM's accounts to make payments on request so the investor-clients would not suspect that their money had been taken. He also sent the investor-clients falsified earnings statements. In some instances, explained in more detail below, he set up monthly payments to investor-clients, representing payments on "annuities." To help conceal his crimes from APAM's other employees, Bleidt arranged for the monthly statements for the

account from which he was embezzling funds to be sent to his home address rather than a business address. Bleidt used the money toward the payroll for his other companies and for personal expenses. He also used it to purchase a radio station.

Inevitably, an investor-client requested a withdrawal that exceeded the liquidity Bleidt had available. On or about November 11, 2004, Bleidt mailed audio tapes to his wife, colleagues, and the SEC confessing his crimes. He then attempted, unsuccessfully, to commit suicide.

On November 12, 2004, the SEC initiated an emergency action in this Court to prevent Bleidt and APAM from dissipating further any assets belonging to the investor-clients. *See* Complaint, *SEC v. Bleidt*, No. 04cv12415–NG (D.Mass. filed Nov. 12, 2004). Bleidt, APAM, and the SEC eventually reached an agreed-upon judgment, in which Bleidt and APAM agreed to "pay, jointly and severally . . . , disgorgement of $31,734,192.75, representing profits gained as a result of the [Ponzi scheme] . . . , together with prejudgment interest thereon in the amount of $9,497,553.30, for a total of $41,231,746.05." Final Judgment as to Defendant APAM, *SEC v. Bleidt*, No. 04cv12415–NG (D.Mass. filed May 3, 2007). In addition, Bleidt was criminally charged with 115 counts of mail fraud and one count of money laundering. He pleaded guilty on all counts and was sentenced to 135 months' imprisonment. Judgment in a Criminal Case, *United States v. Bleidt*, 05cr10144–WGY (D.Mass. Dec. 7, 2005). He was also ordered to pay the same

---

**4.** Bleidt may have made some legitimate investments at Commonwealth on the investor-clients' behalf, though what proportion were above-board—or at least not misappropriations—is not clear on this record.

**5.** There also appear to be instances in the record of third-party checks deposited into an APAM account without the payee's endorse-

ment and where Bleidt forged the payee's signature (though the forgery was subsequently ratified by the investor-client.) *See* Check from The Penn Ins. & Annuity Co. to Bessie Panos, Ex. 7 to Fine Aff. (document # 137) (endorsed by APAM, but apparently not Panos).

$31,734,192.75 in restitution as part of the criminal judgment. *Id.* at 5.

As part of the effort to preserve and maximize assets to be repaid to the investor-clients, the Court appointed David A. Vicinanzo as receiver for APAM. Due to a potential conflict of interest,[6] the Court also appointed David J. Fine ("the receiver") as an ancillary receiver "in matters related to claims or potential claims against banks." Order for Appointment of Ancillary Receiver ("Order for Appointment") at 1, *SEC v. Bleidt,* No. 04cv12415–NG (D.Mass. Mar. 22, 2006). The receiver's mandate is to "institute, prosecute, defend, compromise, adjust, intervene in, or become party to" actions on behalf of Bleidt and APAM against banks. *Id.* at 1–2. He was further directed to "assist the victims of Bleidt's fraud to institute, prosecute, compromise or settle such claims as they may have against banks in their individual capacities, provided that the victims specifically authorize the Ancillary Receiver to do so." *Id.* at 2. As part of that effort, the receiver, along with the named plaintiffs, brought the instant suit against Sovereign. This case concerns the period from June 2000 to November 2004, when Bleidt's fraud was discovered. The Court therefore turns to the specific details of the fraud during that time.

### 2. *Bleidt's Operations at Sovereign*

From 1995 to 2000, Bleidt's scheme was run through account number '876 at a Fleet Bank branch located at 125 Causeway Street, Boston, Massachusetts. Def. Stmt. Facts at 26 (document # 157). As opened, the account was a business checking account. Fleet required submission of a signature card, certification of the taxpayer identification number, and the social security number of the authorized signatory. *Id.;* Bleidt Dep. at 94–95, Ex. 1 to Voke Aff. (document # 158). In June of 2000, Sovereign acquired the Fleet Bank branch on Causeway Street. The account number changed to end with the digits 545, but Sovereign continued to maintain it as a business checking account. Def. Stmt. Facts at 27 (document # 157). It therefore did not use any special procedures applicable to fiduciary or trust accounts. *See id.*[7] The Court refers to this account as "the '545 account." Bleidt was the only authorized signatory on the '545 account. *Id.* at 26.

During the same time, Bleidt had access to several accounts at Sovereign in addition to the '545 account and the "legitimate" account for APAM. Shared Visions, Inc. ("Shared Visions"), FPPS Management, Inc. ("FPPS"), and Perspectives Broadcasting, Inc. ("Perspectives"), each of which was controlled by Bleidt, maintained corporate accounts at Sovereign's Causeway branch.[8] Bleidt was also the only authorized signatory on each of these accounts. *Id.* at 26.

Bleidt's embezzlements took place through the '545 account at Sovereign. There were several different ways in which the frauds might occur. First, an investor-client might simply send him a check for investment, and Bleidt would deposit the check in the '545 account. He would

---

6. Though Vicinanzo had never performed any legal services for the defendant, his law firm had an ongoing relationship with Sovereign.

7. The plaintiffs call the '545 account the "sham APAM account" to distinguish it from another APAM account, the "legitimate APAM account." *See, e.g.,* Pl. Stmt. Facts ¶ 15 (document # 136).

8. It is not clear from the parties' papers how many accounts each of these companies held or what their account numbers were. However, FPPS held an account ending '806, Perspectives held an account ending '798, and Shared Visions held an account ending '694.

then divert the money to the Shared Visions account or the FPPS account, Seipio Dep. at 130–32, Ex. 14 to Voke Aff. (document # 158), and misappropriate it.

Second, to receive funds on demand, Bleidt sometimes had an investor-client withdraw a substantial amount of money from his or her account at Commonwealth on the pretense that a more lucrative investment opportunity had become available to APAM. Bleidt would arrange to have the investor-client receive the money, deposit it in his or her personal bank account, then write a new check to Bleidt for the same amount, essentially laundering the funds to make them appear "new." Bleidt Dep. at 40–42, 81–84, Ex. 1 to Voke Aff. (document # 158). Bleidt would then deposit the funds in the '545 account, and then misappropriate them.

Third, at some point Bleidt began to sell "immediate annuities." A legitimate immediate annuity is a financial instrument in which an investor exchanges a present lump sum of capital for a future income stream—for example, an insurance company might agree to pay an investor a certain monthly amount for 25 years in exchange for an up-front payment of $500,000. Bleidt, however, would merely obtain annuity quotes from various insurance companies. He would present them to the investor-client, pretending that he intended to use the best of the quotes to purchase an annuity on the investor-client's behalf. In reality, upon receiving the lump-sum payment, Bleidt would misappropriate the large majority of the funds while arranging for the monthly "annuity" payment to be made by wire transfer to the investor-client's account. *See id.* at 131–32, 137–38. It is unclear from which account those transfers originated.

The "immediate annuity" version of Bleidt's scheme is particularly important here because it required Bleidt to meet with one of Sovereign's employees, branch manager David McGrath ("McGrath"). Whether Sovereign knew of Bleidt's fraud is one of the key contested factual issues in this case. Initially, Bleidt had to arrange by telephone for the monthly wire transfers from the '545 account to the accounts of the various investor-clients who had purchased "annuities." Because the wires occurred so frequently, Bleidt met with McGrath to obtain "repetitive wire codes" that could be used to identify quickly the sending and receiving accounts. *Id.* at 137–38. Bleidt did not expressly tell McGrath the nature or purpose of the transactions, although in context, as described below, a jury might infer McGrath knew that illegal activities were occurring. *Id.* at 139.

Moreover, in approximately 2003 Sovereign began charging accounts ten dollars for incoming wire transfers, meaning that each of Bleidt's "annuity" payments carried a surcharge for the investor-clients. *Id.* at 141. Seeking to avoid the payments, Bleidt again talked to McGrath and received permission to use Sovereign's Interactive Reporting & Initiation Service ("IRIS"). The IRIS system allowed Bleidt to make the repetitive payments from a computer quickly and for minimal cost. *Id.* at 140–41. In explaining to McGrath why he needed IRIS privileges, Bleidt allegedly told him that the '545 account was a "client disbursement account." *See id.* at 144. McGrath disputes Bleidt's statement, McGrath Dep. at 166–67, Ex. 3 to Voke Aff. (document # 158), and puts this question in play.

The extent to which McGrath was cognizant of other details of the fraud is also disputed. He agreed that he knew that APAM was a business that "managed money on behalf of its customers," *id.* at 165, including investments to be made on their behalf, *see id.* at 140, 166. Further-

more, he recalled that he knew some money was flowing to Bleidt's radio station. *Id.* at 140. He also knew that the inflow into the '545 account was, in part, attributable to individual clients' checks, *id.* at 166, though it is not clear that he knew the funds were meant for further investment. McGrath was aware that the '545 account had been overdrafted, *id.* at 171, but he did not recall the number of times. He further admitted that he knew the '545 account statements were being sent to Bleidt's home address, unlike Bleidt's other accounts at Sovereign, but maintained that he believed in good faith that Bleidt had a reasonable explanation for the difference. *See id.* at 163–64.

McGrath insisted, however, that even though he knew APAM managed money, he believed the '545 account was an "operating business account." *See id.* at 142. He thought its operation was consistent with that characterization. *See id.* at 186–89. *Cf.* Bleidt Dep. at 144, Ex. 1 to Voke Aff. (document #158) (claiming that McGrath "certainly knew that I was taking money out of [an APAM account] to cover payrolls"). According to McGrath, he first learned of Bleidt's fraud when he heard about it from an APAM employee following Bleidt's confession. *Id.* at 80–83. He claims to have had no knowledge that Bleidt was embezzling funds. *Id.* at 200.

Plainly, there is a continuum of states of knowledge of Bleidt's fraud, from actual knowledge of embezzlement to constructive notice of component facts. McGrath's knowledge might have fallen anywhere within it. While the Court accepts the interpretation most favorable to Sovereign on the plaintiffs' Motion for Summary Judgment, *see* Fed.R.Civ.P. 56(c), the question is clearly one for a jury to decide.

### 3. *Sovereign's Policies During Bleidt's Fraud*

The parties also contest the nature and relevance of Sovereign's policies during the time when Bleidt was embezzling funds. The plaintiffs use these policies in two ways. First, as a matter of law, to support their claims that Sovereign was negligent. The policies are arguably relevant to the duty Sovereign owed to its depositor, APAM. Had the bank followed its own procedures, plaintiffs argue, Bleidt's fraud would have surfaced. Second, as a matter of fact, the plaintiffs use these policies to suggest actual knowledge of or willful blindness to Bleidt's fraud. The information that necessarily crossed McGrath's desk pursuant to these policies raises an inference of actual knowledge that Bleidt was misappropriating funds. Moreover, claim the plaintiffs, Sovereign's failure to use the anti-fraud measures available to it to protect the investor-clients constituted willful blindness to their plight.[9]

Three policies, in particular, are at issue. The first is whether Sovereign should have complied with an SEC Rule governing the custody of client funds by investment advisors, 17 C.F.R. § 275.206(4)–2, and its implications for this action. The second is the nature and operation of Sovereign's Carreker–Antinori Fraud Detection software ("the Carreker software"). Finally, the parties differ over whether Sovereign's general policies for examining large balance changes, as well as deposits of third party checks, should have brought certain transactions involving the '545 account to the bank's attention as suspicious behavior.

#### a. *The Carreker Software*

Sovereign's Carreker software flagged activity in an account that was outside the

---

9. The Court briefly addresses below whether, even if Sovereign knew of Bleidt's activities or was wilfully blind to them, it had an obligation to the third-party, non-depositor investors in APAM. *See* section III, *infra.*

norm of the activity on the account, such as a larger than usual deposit. *See* Loycano Dep. at 33–35, Ex. 17 to Voke Aff. (document # 158). The software also handled transactions in new accounts—those that had been in existence for approximately six months—differently than those in established accounts. *Id.* at 37–38, 41. If a transaction was flagged, personnel in Sovereign's loss prevention department reviewed it to ensure that it was not a fraud directed at Sovereign. *Id.* at 45; *see* Fiumara Dep. at 14, Ex. 12 to Voke Aff. (document # 158). The procedure for verifying the transfer depended on the origin of the transferred funds. To verify a check drawn on another bank, a Sovereign employee placed a call to the other bank to verify that sufficient funds were available in the drawer's account. Internal transactions did not require the same verification. *See* Loycano Dep. at 44, Ex. 17 to Voke Aff. (document # 158).

According to the plaintiffs, the Carreker software results should have alerted Sovereign to Bleidt's fraud. Instead, Sovereign "intentionally decided not to use the information" to protect the public at large. Pl. Stmt. Facts ¶ 18 (document # 136). While Sovereign could have detected its depositor's fraud, they contend, Sovereign only made the effort to protect itself from fraud by non-depositors. Sovereign disputes that the decision was intentional. *See* Loycano Dep. at 61, Ex. 17 to Voke Aff. (document # 158); Fiumara Dep. at 72, Ex. 13 to Fine Aff. (document # 137).

In particular, the plaintiffs point to four transactions involving Bleidt-controlled accounts that the Carreker software highlighted for loss-prevention review. The first was a transfer of $100,000 from an unidentified credit account ending in '330 to the '694 Shared Visions account. *See* Carreker Deposit History Inquiry at Bates No. S12363–67 (transfer occurring on Nov. 19, 2003), Ex. 15 to Fine Aff. (document # 137).[10] In the second, some $1.3 million was transferred from the '545 account to the '798 Perspectives account. *See* Carreker Deposit History Inquiry at Bates No. S12350–53 (transfer occurring on Jan. 14, 2004), Ex. 15 to Fine Aff. (document # 137). The third involved the transfer of $250,000 from the '545 account to the '694 Shared Visions account. *See* Carreker Deposit History Inquiry at Bates No. S12354–62 (transfer occurring on Apr. 23, 2004), Ex. 15 to Fine Aff. (document # 137). And in the last, $22,434.21 was transferred from the '545 APAM account into the '806 FPPS account.[11] *See* Carreker Deposit History Inquiry at Bates No. S12348–49 (transfer occurring on June 10, 2004), Ex. 15 to Fine Aff. (document # 137).

Each of these transactions was highlighted for review because of its relatively large size compared to the average deposit for the account to be credited. *See* Loycano Dep. at 38–41, 64, 68, Ex. 17 to Voke Aff. (document # 158). Each transaction was cleared because the bank could immediately verify that the account to be debited had sufficient funds to make the transfer. *See id.*[12] But no one at the bank

---

**10.** This transaction appears to have been a disbursement from a line of credit, though it is not clear who held the line of credit.

**11.** The plaintiffs elsewhere designate this the "new" FPPS account. *See* Chart for May 2004, Ex. 11 to Fine Aff. (document # 137).

**12.** In the statement of material facts, and without citation to the record, plaintiffs submit that Sovereign did not produce the four transactions flagged by the Carreker software to the SEC in response to a November 2004 subpoena. Plaintiffs represent that they reviewed the documents the SEC received from Sovereign and that they did not contain the Carreker documents. In response to an in-

considered the implications of the transfers for APAM's clients.[13]

### b. *Other Deposit Policies*

In addition to monitoring unusual and large deposits through the Carreker software, Sovereign generated from time to time a "large balance change report" identifying accounts with substantial fluctuations. *See* Second McGrath Dep. at 50–51, 54–55, Ex. 16 to Voke Aff. (document # 158). According to Sovereign, the report was primarily a sales tool that allowed managers to target and try to retain particular customers with large balances. McGrath Dep. at 132–33, Ex. 3 to Voke Aff. (document # 158). On more than one occasion, McGrath spoke to Bleidt to try to get him to keep his money at Sovereign, *id.* at 138–39, though it is unclear whether these conversations were related to a large balance change report. The plaintiffs argue that the reports (or the technology underlying the generation of the reports) should have been used to detect money laundering and Bleidt's theft of client funds. Sovereign argues that the reports were merely sales tools and no policy required the manager to read them, much less use them to identify fraud.

Furthermore, Sovereign had special policies in place to handle any particularly large deposits. Any batch deposit totaling $25,000 or more required a manager to examine the first five items in the batch for negotiability. *See* Deposit Review Procedures, Bates No. S011626, S011644, S011662, S011608–09, Ex. to Fine Aff. (document # 137). Individual deposits of $5,000 or more similarly had to be verified by a manager.

Finally, the defendant had particular policies for handling third-party instruments, like a check payable to an investor-client but endorsed as payable to APAM's order. Until July 11, 2002, Sovereign's policy was that such checks were available for deposit only as an exception and only with manager approval. *See* Deposit Review Procedures, Bates No. S011605, S011607–08, Ex. 9 to Fine Aff. (document # 137). If the depositing customer was not known or the relationship between the customer and the instrument's named payee was not well-established, the customer would be required to obtain a signed, notarized Confirmation of Endorsement form prior to deposit. *See id.* at Bates No. S011607–08. Under the revised policy in place after July 11, 2002, tellers were to verify that "[t]he original payee's endorsement matches the payee's name" and "[t]he check meets the seven points of negotiability." *Id.* at Bates No. S011623 (emphasis omitted). If it met both criteria and the original payee was not present, the

---

quiry from plaintiffs' counsel, Sovereign states that it "believes that the Carreker report documents were produced to the SEC with other documents in response to the November 2004 subpoena ... [but] Sovereign is unable to demonstrate definitively that the Carreker reports were provided to the SEC back in 2004." Letter from Michael R. Heyison, WilmerHale, to David J. Fine (Sept. 7, 2007), Ex. 18 to Fine Aff. (document # 137). Notwithstanding counsel's reply, the plaintiffs insist that Sovereign did not include the Carreker documents in the 11,031 pages of documents it made available to plaintiffs. Plaintiffs further state that Sovereign did not produce the documents until July 11, 2007.

They assert this alleged deception as grounds for summary judgment on their claims under Massachusetts General Law ch. 93A. The Court finds this contention without merit.

13. The plaintiffs have not established that McGrath knew of the transactions or would have known about them had the bank exercised due diligence. *See* Mass. Gen. Laws ch. 106, § 1–201(27) (establishing that an organization's knowledge is the knowledge of the institution's representative handling the transaction, or the knowledge that representative would have had if the bank had exercised due diligence).

instrument could be deposited immediately if it was less than $15,000. If $15,000 or more, the instrument was required to be presented to a manager for approval. *See id.* at S011624 (discussing business accounts).

The plaintiffs contend that the deposit review and third-party endorsement review procedures should have alerted Sovereign to Bleidt's fraud.

### B. *Procedural History*

On August 17, 2006, the receiver filed suit against Sovereign. Joining him as plaintiffs were four particular investor-clients: Nancy and Langdon F. Lombard ("the Lombards"), Donna Brandt Lawrence ("Lawrence") and Bessie Panos ("Panos"). Together, these four investor-clients are referred to as "the named plaintiffs" or "the individual plaintiffs." They seek relief not only for themselves, but on behalf of a class of persons and entities similarly situated. Where the named plaintiffs and the receiver act jointly, they are referred to collectively as "the plaintiffs."

Now, near the close of an arduous and heavily contested discovery process, the named plaintiffs seek to certify a class of similarly situated individuals, the victims of Bleidt's fraud. That motion remains pending. All of the plaintiffs seek summary judgment against Sovereign.

### II. *LEGAL STANDARDS*

On the plaintiffs' motion for summary judgment, the Court views the record in the light most favorable to the nonmoving party, Sovereign. *E.g., Mariasch v. Gillette Co.*, 521 F.3d 68, 71 (1st Cir.2008). Summary judgment is proper only if there is no genuine issue of material fact, entitling the moving party to a judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c).

### III. *CLAIMS BY THE INVESTOR-CLIENTS*

Bleidt's former clients—referred to as the "investor-clients"—present difficult and novel issues of Massachusetts law, at least with respect to their negligence claims. It is not clear what duty, if any, Sovereign owes to a person who transacts with one of its depositors but is not herself a customer of the bank. Generally, no duty is owed. *See, e.g., Lerner,* 459 F.3d at 286–87. However, some reviews of Massachusetts case law have indicated that where a professional—a lawyer or an accountant, for example—knows a third party is relying on her statements, she may be held liable for a negligent misrepresentation. *See McCallum v. Rizzo,* No. 94–2878, 1995 WL 1146812 (Mass.Super.Ct. Oct. 13, 1995); *Fleet National Bank v. Gloucester Corp.,* No. 92–11812–REK, 1994 WL 924308 (Aug. 8, 1994).

Moreover, the rule that banks owe no duty to third parties is not monolithic. New York explicitly recognizes a negligence suit by third parties that does not sound in misrepresentation. *See Lerner,* 459 F.3d at 285–86; *Home Sav. of Am. v. Amoros,* 233 A.D.2d 35, 39, 661 N.Y.S.2d 635 (N.Y.A.D.1997). And many other jurisdictions, while following the general rule that a bank owes no duty to a third-party non-customer, have declined to foreclose the possibility of a duty where the bank has actual knowledge that its depositor is breaching a fiduciary duty owed to a third person. *See, e.g., Volpe v. Fleet Nat. Bank,* 710 A.2d 661, 664–65 (R.I.1998) (stating and following general rule, but noting that "extraordinary circumstances" might create liability, and further noting that the case at bar failed to present facts to demonstrate the bank's knowledge of a forgery).

On this record (and on this round of briefing), it is impossible to say whether third-party legal claims of the type recognized in New York, or an extension of the Massachusetts negligent misrepresentation law, would apply here. At the very least, the plaintiffs appear to have raised a genuine issue of material fact regarding one of the key prerequisites for such a suit: Sovereign's knowledge of Bleidt's breach of fiduciary duties owed to the investor-client.

■ To prove Sovereign's knowledge, the plaintiffs must demonstrate both (1) that Sovereign knew Bleidt was a fiduciary to APAM and (2) that Sovereign knew Bleidt's actions constituted a breach of his duties. *See Cahaly v. Benistar Prop. Exch. Trust Co.*, 451 Mass. 343, 353, 885 N.E.2d 800 (2008) (applying New York law); *Invest Almaz v. Temple–Inland Forest Prods. Corp.*, 243 F.3d 57, 82 (1st Cir. 2001) (approving jury instruction under predicted New Hampshire law).

■ First, the plaintiffs have arguably demonstrated that at least one employee, branch manager McGrath, knew that Bleidt was a fiduciary vis à vis APAM and the investor-clients. Under Massachusetts law, a fiduciary relationship is created where one party, the principal, "reposes trust and confidence" in another, the fiduciary, and the fiduciary knows of the principal's reliance upon her. *E.g., Broomfield v. Kosow*, 349 Mass. 749, 212 N.E.2d 556 (1965); *Patsos v. First Albany Corp.*, 48 Mass.App.Ct. 266, 271–72, 719 N.E.2d 882 (1999); *see also* Restatement (Third) of Agency § 1.01 ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). An investment advisor

is a fiduciary. *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 194, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). So is a broker. *Berenson v. Nirenstein*, 326 Mass. 285, 288, 93 N.E.2d 610 (1950).

McGrath admitted that he knew that Bleidt and APAM "managed money on behalf of customers" and that they took "checks from individuals that were being deposited into the ['545] business account." McGrath Dep. at 165–66, Ex. 3 to Voke Aff. (document # 158). He further said he knew that "some of the money that [Bleidt] was depositing into the ['545] business account was going out so that he could make investments for his customers, or the company, either/or." *Id.* at 139–40. Taken together, these three pieces of knowledge arguably demonstrate that McGrath knew that the investor-clients reposed confidence in Bleidt; knew that the investor-clients entrusted Bleidt and APAM with their money; and knew that Bleidt was making "investments" on the investor-clients' behalf. If so, McGrath arguably knew Bleidt was a fiduciary with respect to funds in the '545 account. Questions would remain, though, as to when McGrath acquired the knowledge and the effect of his failure to transmit it to other employees at the bank. *See* Mass. Gen. Laws ch. 106, § 1–201(27) (defining knowledge for organizations).

■ Moreover, the plaintiffs could arguably prove that Sovereign knew Bleidt breached his fiduciary duty with respect to the investor-clients. Regardless of the specific rules placed on investment advisors, Sovereign arguably knew that Bleidt was commingling APAM's own funds and the investor-clients' funds in the '545 account. *See* McGrath Dep. at 139–40, Ex. 3 to Voke Aff. (document # 158) (admitting that he knew some money went out of the '545 account for both APAM and clients); Bleidt Dep. at 144, Ex. 1 to Voke Aff.

(document # 158) (saying that McGrath "must have" known that he used APAM accounts both as client disbursement accounts and to cover company payroll). *But see* McGrath Dep. at 166–67, Ex. 3 to Voke Aff. (document # 158) (denying that Bleidt informed him the '545 account was a "client disbursement account"). In at least some circumstances—for example, where the fiduciary is a trustee—commingling is a per se breach of duty. *See, e.g., Quinton v. Gavin,* 64 Mass.App.Ct. 792, 794, 835 N.E.2d 1124 (2005). And more generally, any agent has a duty "not to deal with the principal's property so that it appears to be the agent's property" and "not to mingle the principal's property with anyone else's." Restatement (Third) of Agency § 8.12(1)-(2).[14] It is not clear how to reconcile McGrath's belief that the '545 account was a "business operating account," McGrath Dep. at 142, 186–89, Ex. 3 to Voke Aff. (document # 158), which the Court accepts for purposes of the plaintiffs' Motion for Summary Judgment, with his arguable knowledge of the commingling.

Because of the factual and legal complexity of the investor-clients' claims against Sovereign, it is sounder to **RESERVE** ruling on their claims until after the defendant files a motion for summary judgment. Sovereign's motion will reframe the facts and law, and issuing a single ruling as to the legal questions will ensure clarity.

The issues pertaining to the receiver are clearer, and the Court turns to them now.

## IV. *IN PARI DELICTO*

■ According to Sovereign, the receiver's claims—brought on behalf of APAM—are precluded by the *in pari delicto* defense.[15] As one Massachusetts court has put it,[16] the defense "bars a plaintiff who has participated in wrongdoing from recovering damages resulting from the wrongdoing." *Choquette v. Isacoff,* 65 Mass.App. Ct. 1, 3, 836 N.E.2d 329 (2005). Thus, it is an equitable affirmative defense similar to the concept of unclean hands.[17] *Nisselson v. Lernout,* 469 F.3d 143, 151 (1st Cir. 2006).

■ To make out the affirmative defense, a defendant must prove two elements. First, the plaintiff must bear at least substantially equal responsibility for the wrong as compared to the defendant. Second, preclusion of the suit must not interfere with the purposes of the underlying law or harm the public interest. *Id.* at 152. Each element is examined in turn.

---

**14.** In appropriate circumstances, these duties can be overridden by agreement of the agent and fiduciary. *Id.* cmt. c.

**15.** Translated literally, the term means "in equal fault." *Baena v. KPMG LLP,* 453 F.3d 1, 6 & n. 5 (1st Cir.2006).

**16.** Because the receiver's claims are predicated on state law, state law also controls the extent to which the *in pari delicto* defense applies. *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 84, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994).

**17.** At least one court has suggested that, strictly speaking, *in pari delicto* is the defense as it sounds in law, and "unclean hands" is the defense as it sounds in equity. *See Byron v. Clay,* 867 F.2d 1049, 1052 (7th Cir.1989). It is a distinction without a difference. *See id.* ("[W]ith the merger of law and equity, it is difficult to see why equitable defenses should be limited to equitable suits any more; and of course many are not so limited...."). The essence of the *in pari delicto* defense is plainly equitable, as it is founded on the principle that the Court should not lend its good offices to aid wrongdoers. *See Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306–07 & nn. 12 & 13, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985).

## A. Whether APAM Bears At Least Substantially Equal Responsibility for the Wrong

The first element of the affirmative defense is simple: a plaintiff should not be able to recover for a wrong he substantially caused. Courts reason that they should not intervene to help one wrongdoer against another, but leave the loss as it lies. Furthermore, the doctrine effectively deters illegal action. *Nisselson,* 469 F.3d at 151 (citing *Bateman Eichler,* 472 U.S. at 306, 105 S.Ct. 2622).

■ When considering corporations, however, the *in pari delicto* defense is tempered by an important exception. "A corporation is a separate and distinct legal entity ... [that] can only act through its agents." *Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.,* 425 Mass. 63, 66, 679 N.E.2d 540 (1997). Generally speaking, when a corporation's agent is acting within the scope of his employment and on the corporation's behalf, his acts are imputed to the corporation. *See, e.g., Commonwealth v. Angelo Todesca Corp.,* 446 Mass. 128, 135–36, 842 N.E.2d 930 (2006); *Sarvis v. Boston Safe Deposit & Trust Co.,* 47 Mass.App.Ct. 86, 96, 711 N.E.2d 911 (1999). As a corollary, where an agent acts contrary to a corporation's interest, those acts are not to be imputed to the corporation. *Nisselson,* 469 F.3d at 156; *Baena,* 453 F.3d at 8; *see also Sunrise Props.,* 425 Mass. at 67, 679 N.E.2d 540 ("[A]n agent's knowledge of his own unauthorized acts is not imputed to the principal when the agent has acted fraudulently toward the principal and is engaged in an independent fraudulent act from which the principal does not benefit."). This corollary is the "adverse interest exception" to the *in pari delicto* rule.

Here, the receiver contends, Bleidt's actions as an officer of APAM were contrary to the corporation's interest. Pls.' Reply Mem. at 14–15 (document # 166). Bleidt misappropriated funds from APAM's accounts for his personal use. *See* Bleidt Dep. at 88, 138–40, Ex. 1 to Voke Aff. (document # 158). Looting a corporation's assets is a "classic example" of the adverse interest exception. *Baena,* 453 F.3d at 8. Clearly, then, Bleidt's actions facially fit within the adverse interest exception.

Sovereign, though, invokes a further exception to the adverse interest exception. Where a corporation's agent effectively is himself the corporation—where the actor and the corporation are alter egos—even acts that harm the corporation cannot be considered "adverse." *See Demoulas v. Demoulas,* 428 Mass. 555, 584–55, 703 N.E.2d 1149 (1998); *Anderson v. K.G. Moore, Inc.,* 6 Mass.App.Ct. 386, 390, 376 N.E.2d 1238 (1978) (act of agent "known to and acquiesced in by all the ... directors, officers, and shareholders of the corporation ... was ... enforceable as an act of the corporation"); *Grassmueck v. Am. Shorthorn Ass'n,* 402 F.3d 833, 838 & n. 5 (8th Cir.2005). Because there is no separation between principal and agent, this is sometimes known as the "sole actor" doctrine. *Grassmueck,* 402 F.3d at 838.[18]

Bleidt was APAM's sole director and its sole shareholder. *See* Bleidt Dep. at 94, Ex. 1 to Voke Aff. (document # 158). APAM was therefore effectively on notice

---

**18.** It is not necessary fully to pierce the corporate veil in order for the sole actor doctrine to apply. *See Baena,* 453 F.3d at 8 (noting that it is "debatable" whether application of the *in pari delicto* defense should turn on agency law principles, but noting that "agen-cy-based imputation rules appear to operate in Massachusetts"); *Grassmueck,* 402 F.3d at 838–39 (analyzing sole actor doctrine under agency law); *In re Mediators, Inc.,* 105 F.3d 822, 827 (2d Cir.1997) (same).

that one of its agents was self-dealing, but acquiesced in it. Bleidt's decisions were authorized by APAM and made on its behalf. *In re Mediators, Inc.*, 105 F.3d at 827. And Bleidt, as the instigator of the fraud, plainly bears equal responsibility as compared to Sovereign for the wrongdoing perpetrated on third parties—if not considerably more. Therefore, the Court must conclude that for the purposes of the first element of the *in pari delicto* affirmative defense, APAM also bears responsibility at least substantially equal to Sovereign's.

### B. Whether Preclusion of the Receiver's Suit Interferes with the Policy of the Underlying Law or the Public Interest

APAM's responsibility, however, is not dispositive. The Court must also determine whether applying the defense would interfere with the purposes of the underlying law or harm the public interest. *Nisselson*, 469 F.3d at 152. This consideration embodies the fact that *in pari delicto* is ultimately an equitable defense. In this case, the equitable calculus is changed by the fact that neither APAM nor Bleidt are suing on their own behalf. Instead, the suit is brought by APAM's receiver.

It is true, as Sovereign argues, that the receiver takes claims as they were held by the entities he represents. The Court appointed the receiver and directed him to "institute . . . legal or equitable actions . . . on behalf of Bleidt [and his associated companies]" in "matters related to claims or potential claims against banks." Order for Appointment at 1, *SEC v. Bleidt*, No. 04cv12415–NG (D.Mass. Mar. 22, 2006). The Order was issued pursuant to the inherent power of this Court to manage and conserve a defendant's assets during the pendency of litigation. *See, e.g., In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994).

That Order, however, cannot alter the legal rights of the parties. The plaintiff, even as receiver, stands in the shoes of the person and entities he represents. Legally speaking, then, Fine can only sue on behalf of Bleidt or the entities named in the Order for Appointment. *See Fleming v. Lind–Waldock & Co.*, 922 F.2d 20, 25 (1st Cir.1990). And as explained above, both Bleidt and APAM are subject to the defense.

Nevertheless, despite the legal rule, the Court must evaluate the equities; as noted above, *in pari delicto* is an equitable defense. A court must consider whether "preclusion of the suit would not interfere with the purposes of the underlying law or otherwise contravene the public interest." *Nisselson*, 469 F.3d at 152 (citing *Choquette*, 65 Mass.App.Ct. at 4–5, 836 N.E.2d 329); *see also Arcidi*, 447 Mass. at 620–22, 856 N.E.2d 167 (discussing equitable nature of the defense). Analyzing claims brought by a receiver, some courts have found that "the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated"—that is, when the wrongdoer cannot benefit from the suit. *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir.1995); *see also Bateman Eichler*, 472 U.S. at 306–08, 105 S.Ct. 2622 (discussing, in securities fraud case, general equity background of defense); *McCandless v. Furlaud*, 296 U.S. 140, 159–61, 56 S.Ct. 41, 80 L.Ed. 121 (1935) (receiver not barred by *in pari delicto* where debtor's agents participated in wrongdoing).[19]

---

19. Notably, in considering whether a representative is barred by the *in pari delicto* defense, courts have distinguished between a receiver and a bankruptcy trustee. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty*, 267 F.3d 340, 358 (3d Cir.2001); *In*

Even though the receiver was appointed pursuant to the equity powers of a federal court, state law controls. *See O'Melveny & Myers v. FDIC,* 512 U.S. at 84–85, 114 S.Ct. 2048. Massachusetts courts have not specifically addressed the issue—though they have indicated that an exception to the *in pari delicto* rule obtains for "cases where the public interest requires that [the courts] should, for the promotion of public policy, interpose, and the relief in such cases is given to the public through the party." *Choquette,* 65 Mass.App.Ct. at 4, 836 N.E.2d 329 (quoting *Council v. Cohen,* 303 Mass. 348, 354–55, 21 N.E.2d 967 (1939)) (internal quotation marks omitted) (alteration in *Choquette*).

To determine whether Massachusetts would include receivership, in appropriate circumstances, as a possible invocation of the public policy exception, the Court looks to persuasive decisions in other jurisdictions. *See, e.g., Stratford Sch. Dist., S.A.U. v. Employers Reinsurance Corp.,* 162 F.3d 718, 720 (1st Cir.1998) (predicting "how the Supreme Court of New Hamp-

shire would resolve this issue [by] relying on guidance from analogous decisions in other states and other legal authorities"); *see also Foster v. Hurley,* 444 Mass. 157, 163, 826 N.E.2d 719 (2005) (looking to Massachusetts precedent and "persuasive authority from other jurisdictions" to determine whether equitable remedy should be available).

The leading case on receivers and the *in pari delicto* defense is Judge Posner's decision in *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995). In *Scholes,* one Michael S. Douglas ran a Ponzi scheme through three corporations, each of which were considered to be his mere "robotic tools." *See id.* at 754. Douglas fleeced investors by promising them fantastic rates of return if they purchased shares in the partnerships; when they did so, Douglas embezzled and dissipated the funds. The receiver, acting on behalf of the corporations Douglas had controlled, brought claims against transferees of corporation property based on an Illinois fraudulent conveyances statute. Despite the close connections between Douglas and his three companies, the cor-

---

*re Hedged–Investments Assocs., Inc.,* 84 F.3d 1281, 1285 & n. 5 (10th Cir.1996). The defendants' citation to the contrary, *Boston Trading Group v. Burnazos,* 835 F.2d 1504, 1515 (1st Cir.1987), is unpersuasive. *Burnazos,* like the Supreme Court case it relied on, *Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 427–29, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), concerned the standing of a receiver or trustee to seek relief directly on behalf of a third party. *See Caplin,* 406 U.S. at 427, 429, 92 S.Ct. 1678; *Burnazos,* 835 F.2d at 1515. In that narrow sense, receivers and trustees are similarly situated: both are limited to rights of action held by the debtor companies they represent.

But that is not to say the specific contours of those rights are identical. The rights of a bankruptcy trustee are fixed as of the moment of the petition, while those of a receiver are not. In *Lafferty,* for instance, the court noted that at the moment the bankruptcy commenced, a family that had conspired to create

a Ponzi scheme still controlled the debtor company. 267 F.3d at 355. Because a bankruptcy trustee's rights are strictly limited to those that existed when the bankruptcy commences, *see* 11 U.S.C. § 541, the court held that the *in pari delicto* defense was to be evaluated as if the family still controlled the debtor corporation. Post-petition events, like extricating the corporation from the wrongdoers' control, could not be considered. *See Lafferty,* 267 F.3d at 356–58 (quoting *Hedged–Investments,* 84 F.3d at 1285–86). A receiver, by contrast, is said to stand in the shoes of the party or parties he represents, *Fleming,* 922 F.2d at 25, but is not subject to an explicit limiting command like § 541 of the Bankruptcy Code. The Court may therefore take into account post-appointment events, including the effective divestment of the wrongdoer from any stake in the recovery-events that may alter the *in pari delicto* calculus. *See Lafferty,* 267 F.3d at 358.

porations were each, "in the eyes of the law[,] separate legal entities with rights and duties." *Id.* The Seventh Circuit reasoned that Douglas—who was the real wrongdoer—could not receive any benefit from moneys awarded to the receiver. Instead, the funds would go to the victims. It therefore found that the *in pari delicto* defense did not apply. *Id.*

The Ninth Circuit has also concluded that receivers are not necessarily barred by *in pari delicto*. In *FDIC v. O'Melveny & Myers,* 61 F.3d 17 (9th Cir.1995), the court explained—albeit without great elaboration—that under California law, "defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver." *Id.* at 19 (citing *Camerer v. California Sav. & Commercial Bank,* 4 Cal.2d 159, 170–71, 48 P.2d 39 (1935)). Balancing the equities in the case before it, the Ninth Circuit noted that the receiver was not a party to the original inequitable conduct and that applying the in pari delicto defense would place losses on innocent creditors rather than the allegedly culpable defendant. *Id.* Furthermore, the Ninth Circuit relied on the fact that the FDIC was part of "an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver . . . ." *Id.*

At the same time, it is clear that it is not always correct to exempt a receiver from an *in pari delicto* defense. The outcome depends on the balancing of the equities in each case. For instance, a later Seventh Circuit decision, *Knauer v. Jonathon Roberts Financial Group, Inc.,* 348 F.3d 230 (7th Cir.2003), distinguished Scholes and upheld a defense judgment based on the *in pari delicto* defense. In *Knauer,* the wrongdoers—Kenneth R. Payne, Daniel

Danker, and others—held themselves out as registered securities dealers in order to execute a Ponzi scheme. After the scheme collapsed, a receiver brought suit on behalf of Payne and Danker's corporations against the broker-dealers Payne and Danker had purportedly represented, claiming that the broker dealers had controlled Payne and Danker's actions and that they had negligently supervised them.

Notably, while the plaintiffs in *Scholes* had sought to rescind fraudulent conveyances made by the corporations as drawers, the *Knauer* plaintiffs' claims sounded in tort, including negligence. *Id.* at 232. The different theory of liability was the principal reason the Seventh Circuit permitted the *in pari delicto* defense. Whereas the *Scholes* defendants had obtained a benefit from the conveyance of funds, the *Knauer* plaintiffs' claims were "for tort damages from entities that derived no benefit from the embezzlements, but that were allegedly partly to blame for their occurrence." *Id.* at 236. A second and related factor the Seventh Circuit found persuasive was that the plaintiffs' claims were based on the wrongdoers' agent-principal relationship with the defendant broker-dealers. Because Payne and Danker had at least equally strong agent relationships with the Ponzi corporations, of which they were employees, as with the defendant broker-dealers, of which they were representatives, the Seventh Circuit reasoned it would be inequitable to impose agent-principal liability on the defendants. *See id.* at 237.

Many state courts have suggested in dicta that, at least in proper circumstances, the doctrine of *in pari delicto* would not apply to a receiver if equity demanded a different result. *See ISP.com LLC v. Theising,* 805 N.E.2d 767, 773 (Ind. 2004); *Myatt v. RHBT Financial Corp.,* 370 S.C. 391, 396–97, 635 S.E.2d 545

(S.C.Ct.App.2006); *Freeman v. Dean Witter Reynolds, Inc.*, 865 So.2d 543, 550 (Fla. App.2d Dist.2003); *Albers v. Continental Illinois Bank & Trust Co.*, 296 Ill.App. 596, 600–01, 17 N.E.2d 67 (1938); *Camerer*, 4 Cal.2d at 170–71, 48 P.2d 39; *Brooke v. Kennedy*, 172 Ga. 461, 158 S.E. 4, 5 (1931). *See also Javitch v. Transamerica Occidental Life Ins. Co.*, 408 F.Supp.2d 531, 538 (N.D.Ohio 2006) (declining to apply *in pari delicto* defense to equity receiver).

When combined with the flexibility envisioned in *Choquette*, 65 Mass.App.Ct. at 4–5, 836 N.E.2d 329, the weight of authority from other jurisdictions is persuasive. Massachusetts courts would allow a receiver to avoid the defense if the equities so required. Practically speaking, the Court would implement such a holding by declining to acknowledge the sole actor doctrine. It would thereby reinstate the legal separation between Bleidt and his corporations—formerly "evil zombies," now released from his control. *See Scholes*, 56 F.3d at 754–55.

■ Precisely how to balance the equities, however, is less clear. Three relevant factors can be gleaned from the federal appellate cases discussed above.[20] First, whether the wrongdoer would benefit from the receipt of the funds sought by the receiver. *See id.*, 56 F.3d at 754–55. Second, whether the defendant in the case gained some illegitimate benefit from the wrongdoer's act. *Cf. Knauer*, 348 F.3d at 236. Third, whether applying the *in pari delicto* defense would frustrate the purposes of the law the receiver seeks to invoke. *See Nisselson*, 469 F.3d at 152;

*FDIC v. O'Melveny & Myers*, 61 F.3d at 19. The Court discusses each factor in turn.

### 1. Whether the Wrongdoer Stands to Gain from the Suit

First, the Court looks to whether Bleidt—the real wrongdoer in the suit—stands to gain from the receivership's recovery of funds. *See Scholes*, 56 F.3d at 754–55. In some sense, of course, Bleidt would benefit by having a portion of his debt to the investor victims discharged. But in this case, as a practical matter, he will not realize a gain. Bleidt's assets have already been entirely liquidated in order to pay restitution in his criminal case, so any discharge through a judgment against Sovereign would not protect his property. Moreover, in the likely event that the judgment fails to retire Bleidt's debt, he will still face the difficult task of making restitution after his eventual release from prison.

A second objection is that Sovereign's exposure in the case theoretically exceeds the amount of APAM's debt, meaning that the receivership could make the restitution the Court ordered in the Final Judgment as to Defendant APAM, *SEC v. Bleidt*, No. 04cv12415-NG (D.Mass. filed May 3, 2007), and still hold a net positive balance. The receiver alleges that Sovereign was partially responsible for the loss of some $22 million dollars by the investor victims, and one of the receiver's claims is brought under Massachusetts General Laws ch. 93A, § 2, which could conceivably permit an award of treble damages. *See id.* § 11.

---

**20.** A fourth equitable consideration is that there are simply no good procedural alternatives for investor victims. *See Scholes*, 56 F.3d at 755 (discussing possibilities of individual suits by victims, class actions, and adversary bankruptcy actions, and concluding that a suit by a receiver is the most expedient and still preserves the defendants' rights). That consideration is particularly strong here, as many of Bleidt's victims·are elderly and were relying on their savings and investments. In this case, it weighs in favor of permitting the receiver's suit; it need not be discussed further.

But Bleidt "has been ousted from control of and beneficial interest in the corporations." *Scholes,* 56 F.3d at 754. Any excess money in the receivership will plainly go to the investors, not to Bleidt.

## 2. *Whether the Defendant Gained from the Fraud*

The second factor the Court considers is whether the defendant gained some benefit from the wrongdoer's act. In *Scholes,* for example, the plaintiffs sought rescission of fraudulent conveyances. *See id.* at 757–59 (discussing claims). Some of the defendants in that case had received payments from the wrongdoer well in excess of what he owed to them. Obviously, those defendants gained an illegitimate benefit, and a receiver may properly sidestep the *in pari delicto* defense in order to sue for disgorgement of the benefit to satisfy the wrongdoer's tort creditors. *See id.* at 755, 757. *Knauer* provides a useful contrast. In that case, the Seventh Circuit reasoned that the defendant broker-dealers' role was minor, and that there was "no allegation whatsoever that the defendants were directly involved in the embezzlements or benefitted from them." *Id.* at 237.

Unlike the transferee defendants in *Scholes,* Sovereign did not gain an immediately identifiable and illegitimate benefit the receiver can seek to rescind. And like *Knauer,* the receiver's theory of liability ultimately sounds in tort. On the other hand, Sovereign may have received a more substantial benefit than the *Knauer* defendants did. In *Knauer,* there was no allegation that the broker dealers received any benefit from Payne and Danker's fraudulent transactions. In this case, by contrast, Bleidt's fraud led to the deposit of a large sum of money with the bank. It received some $26,800 in fees over the life of the '545 account, Def. Stmt. Facts at 29 (document # 157), and also had the oppor-

tunity to lend the money it held on deposit. If Sovereign knew of Bleidt's fraud or was willfully blind to it, one might infer that its motivation was the use of the deposit—an inference that would arguably justify imposing liability in this case. This, however, is a question best left until the facts become clear at trial.

## 3. *Whether Applying the Defense Would Frustrate the Purpose of the Law*

Third, the Court examines whether allowing the defendants to evade responsibility by invoking the *in pari delicto* defense would frustrate the purposes of the law. *See Nisselson,* 469 F.3d at 152; *FDIC v. O'Melveny & Myers,* 61 F.3d at 19. This consideration has applied with greatest force where defendants have sought to use *in pari delicto* as a shield against statutes passed to rectify perceived inadequacies in the common law. *See Bateman Eichler,* 472 U.S. at 310–11, 105 S.Ct. 2622 (concluding that permitting broad reading of *in pari delicto* would frustrate purpose of federal securities laws); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 138–40, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (rejecting defense as applied to antitrust suits). Here, the receiver seeks to invoke securities regulations; other claims are based in common law and Massachusetts statutes adopting the Uniform Commercial Code.

Whether the law would be frustrated is a question that will turn on the facts at trial. As commentators have long noted, even where parties bear substantially equal fault for the wrong, "there may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be." 1 J. Story, *Equity Jurisprudence* 305 (13th ed. 1886), *quoted in Bateman Eichler,* 472 U.S. at 307, 105 S.Ct. 2622. Here, there

may be compelling public policy reasons why liability should be imposed—for example, if the receiver is able to prove that Sovereign aided and abetted Bleidt in raiding APAM's accounts. Arguably, a bank with actual knowledge of a fraudulent transaction is the best situated actor to intervene and prevent the fraud. On the other hand, while that may be an appropriate rationale to protect third parties, it might not be appropriate to protect a corporate shell, like APAM.

Moreover, the general appropriateness of allowing Sovereign to assert the *in pari delicto* defense depends on the degree to which it is responsible for the harms suffered by all the plaintiffs. Where a major fraud like Bleidt's has been perpetrated, allegedly facilitated in part by Sovereign, for what percentage of fault for the overall harm must Sovereign be responsible in order to justify liability despite the *in pari delicto* principle? It is not a question that is easy for the Court to answer on this record. Like comparative negligence, it may be a question best left to the jury.

Two of the three equitable factors informing the Court's decision on the *in pari delicto* defense require clarification of disputed issues of fact. The Court will therefore defer adjudication of the defense until after trial. Sovereign may obviously renew this defense in a motion for directed verdict.

## V. *SOVEREIGN'S KNOWLEDGE OF BLEIDT'S BREACH OF DUTIES TO APAM*

Clearly, one of the key issues in this case will be the extent to which Sovereign knew of Bleidt's breaches of his fiduciary duties. There is a continuum into which that knowledge may fall—especially where, as here, much of the evidence is circumstantial, not direct. On one end of the continuum is specific and actual knowl-edge that Bleidt was breaching his fiduciary duties. Near the other is constructive notice—if Sovereign had investigated, it would have been able to discover that Bleidt was breaching his duties.

To prove that Sovereign aided and abetted Bleidt's actions, the receiver must show that it knew of the breach of fiduciary duty. *See Arcidi*, 447 Mass. at 623, 856 N.E.2d 167. Similarly, to succeed on the negligence claim, the receiver must demonstrate "actual knowledge" of the misappropriation. *Schlichte*, 40 Mass.App.Ct. at 181, 662 N.E.2d 238. And as noted above, proving knowledge of a fiduciary breach requires the plaintiffs to prove both knowledge of fiduciary status and knowledge that the action was a breach.

The parties' briefs address almost exclusively Sovereign's knowledge regarding Bleidt's breach of his duties to the investor-clients. That issue involves complex issues of law and fact; as noted above, the Court does not address them here. The question of Sovereign's knowledge of Bleidt's breach of the fiduciary duty he owed to APAM is related, but simpler.

First, Bleidt owed an independent fiduciary obligation to APAM as its director and agent. *See, e.g., Blackstone v. Cashman*, 448 Mass. 255, 267, 860 N.E.2d 7 (2007) ("It is a basic principle of our corporate law that a director has a fiduciary relationship with the corporation."); *see also Sunrise Props.*, 425 Mass. at 66–67, 679 N.E.2d 540 (discussing generally corporations and agents). Loyalty was one aspect of that obligation. *Blackstone*, 448 Mass. at 267, 860 N.E.2d 7. And Bleidt plainly breached that duty by misappropriating money from the company for his own purposes.

Second, it seems very likely that Sovereign knew that Bleidt was an agent (and thus owed his corporation a fiduciary

duty.) Corporations can only act through their agents. *Sunrise Props.*, 425 Mass. at 66, 679 N.E.2d 540. Sovereign had on file APAM's corporate resolution creating the '545 account and authorizing Bleidt as a signatory. Corporate Resolution (Feb. 2, 1995), Ex. 2 to Voke Aff. (document # 158). And in the ordinary course of business Sovereign would have been familiar with the activities of corporate agents.

■ At least on this record, though, there is a genuine issue of material fact as to whether Sovereign knew that Bleidt was misappropriating APAM's funds. To be sure, Sovereign was entitled to presume that Bleidt was performing his duties lawfully, even when he transferred money to the accounts of other corporate entities he controlled. *See, e.g., Banks v. Everett Nat'l Bank*, 305 Mass. 178, 181, 25 N.E.2d 177 (1940) ("A bank, acting in good faith, that merely credits funds it knows are trust funds to the personal account of the trustee is not liable if the trustee subsequently misappropriates these funds."). The receiver has not overcome that presumption, precluding summary judgment on the aiding and abetting and negligence counts.

Relatedly, the receiver has not demonstrated that Bleidt's misappropriations of APAM's funds meet the criteria set forth in Massachusetts General Laws ch. 106, § 3–307(b)(2)-(4). Nor has the receiver demonstrated that Sovereign had notice that Bleidt's acts on APAM's behalf were beyond his apparent authority, *cf. id.* § 1–201(43) (defining unauthorized signature as "one made without … apparent authority"); *id.* § 3–302(a)(2)(iv), or otherwise defeated a potential holder in due course defense Sovereign might raise. The receiver must also be denied summary judgment on the conversion claim.

## VI. *CONCLUSION*

For the foregoing reasons, the Court **DENIES** the Plaintiffs' Motion for Summary Judgment (document # 133) as it is made by the receiver, and **RESERVES ruling** as it is made by the individual plaintiffs. The Court will further address the issues raised by the parties' papers if Sovereign files a motion for summary judgment or at an appropriate time before the start of trial—for example, as necessary to prepare jury instructions.

**SO ORDERED.**